Xuebiao Yᴀᴏ, Petitioner-Appellant,†

v.

Bᴏᴀʀᴅ ᴏꜰ Rᴇɢᴇɴᴛꜱ ᴏꜰ the Uɴɪᴠᴇʀꜱɪᴛʏ ᴏꜰ Wɪꜱᴄᴏɴꜱɪɴ Sʏꜱᴛᴇᴍ, Respondent-Respondent.

Court of Appeals

*No. 01–2160. Submitted on briefs January 11, 2002.—Decided June 27, 2002.*

2002 WI App 175

(Also reported in 649 N.W.2d 356.)

† Petition to review denied 9-26-02.

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *James A. Olson, Marsha M. Mansfield* and *John C. Carlson Jr.* of *Lawton & Cates, S.C.*, Madison.

On behalf of the respondent-respondent, the cause was submitted on the brief of *Jennifer Sloan Lattis*, assistant attorney general, and *James E. Doyle*, attorney general.

Before Vergeront, P.J., Roggensack and Deininger, JJ.

¶ 1. DEININGER, J. Xuebiao Yao appeals an order which affirmed a decision by the Board of Regents of the University of Wisconsin to dismiss him from his position as an assistant professor at the UW-Madison. The board concluded that Yao had engaged in misconduct which constituted just cause for his dismissal. Yao claims the board erroneously considered certain videotape evidence and that it erred in finding that he had intentionally sabotaged another researcher's experiment because its decision "failed to take into account evidence that would exonerate" him. We reject Yao's arguments and affirm the appealed order.

## BACKGROUND

¶ 2. Dr. Xuebiao Yao, a cell biologist and native of China, was recruited to come to the University of Wisconsin-Madison to join its Physiology Department as an assistant professor. He arrived at the UW-

945

Madison in February 1998, and was assigned laboratory space across the hall from Dr. Edwin Chapman, also an assistant professor in the Physiology Department, who was engaged in research involving bacteria-produced proteins.

¶ 3. In mid- to late-1998, Chapman and research assistants working under him began experiencing problems with their experiments. The temperature setting on a piece of laboratory equipment was increased on several occasions to the point that experimental materials were damaged. In other instances, experiments were ruined by the apparent presence of bleach or salt added to laboratory containers, and in some cases, from the switching or relabeling of tubes and flasks. Chapman and his assistants devised some "traps" to verify that someone was in fact interfering with their work. In addition to the usual, removable labels, they also coded their tubes and flasks with hidden duplicate markings. By doing so, they were able to verify that the regular labels were in fact being switched on occasion.

¶ 4. Chapman believed that his suspicions of tampering were thus confirmed and he contacted his department chairman and the University of Wisconsin Police. UW police detectives assisted Chapman in installing two video cameras in hopes of catching the perpetrator. One camera was mounted in a hallway, and the other over a "shaker" in a common equipment room situated between Chapman's and Yao's laboratories. The shaker is a device which vibrates and maintains a constant temperature for bacteria cultures in tubes and flasks so as to promote bacteria growth. The shaker in the common equipment room was purchased in part with Yao's laboratory start-up funds, and in part with departmental funds. Even though Yao placed a label on the shaker saying "Yao Lab," the understanding be-

tween Yao and Chapman was that Chapman and his assistants would be able to use the shaker from time to time.

¶ 5. Chapman was given four videotapes that he employed as follows. He placed a tape in each hidden camera, which would record a twenty-four hour period compressed into a two-hour, "time lapse" tape. Chapman would then remove the two tapes, place the two remaining tapes in the cameras, and during the next twenty-four hours he would review the recorded tapes to see if any suspicious activities were observable in the hallway or with respect to items placed in the common shaker. Chapman would then recycle the tapes for the next twenty-four hour period. As a result of reusing the tapes in this fashion, no more than twenty-four to forty-eight hours of taping were ever preserved at any one time. The hidden cameras were installed in late November 1998.

¶ 6. On Saturday, December 5, 1998, Chapman reviewed a tape from the common equipment room which had run from approximately noon on Friday, December 4th through noon on Saturday, December 5th. On this tape, Chapman observed several of his assistants placing "overnight culture tubes" in the shaker. The procedure involved overnight incubation of bacteria cultures in the shaker, some of which were to be transferred the next morning to two-liter flasks, which would subsequently be "induced" to begin manufacturing the proteins involved in Chapman's experiments. The tape showed that one of Chapman's students placed a half-dozen tubes in the shaker, and two other Chapman students placed a number of tubes in the shaker, all doing so between 4:00 and 6:00 p.m. on Friday. Then, at a little past 7:00 p.m., the tape shows Yao coming to the shaker and handling two of the tubes

947

belonging to the first student, but it is not clear from the tape what Yao did with the tubes while he handled them. Yao replaced the tubes in the shaker, and he is also seen on the tape a few minutes later coming back to the shaker and looking into it.

¶ 7. Later in the tape, at about 6:00 a.m. on Saturday, one of Chapman's students is seen coming to the shaker and removing tubes. The student took these tubes off-camera where, according to his testimony, he transferred the cultures to two-liter flasks. He then returned with four of the two-liter flasks and inserted them in the shaker. At this point Chapman, who believed the tampering was happening during nighttime hours, stopped reviewing the December 4–5 tape. He was somewhat puzzled by Yao's activities on Friday evening, but thought little of it, as he did not suspect Yao of tampering with his experiments. In fact, he had given UW Police three other names as potential suspects, and had personally confronted one of his research assistants regarding his suspicions of her.

¶ 8. Because he was somewhat intrigued by Yao's activities, however, Chapman decided to retain this tape to review again on Monday. He therefore directly recycled one of the shaker tapes on Sunday, December 6, without viewing it. As a result, no tape is available for the shaker camera for a portion of the weekend. On Monday, December 7th, Chapman reviewed the December 4–5 tape again and decided there was nothing conclusive on it, so he put it in one of the cameras at about 5:00 p.m. About an hour later, one of Chapman's assistants came to him and showed him the results obtained from the four two-liter flasks that had been in the common equipment room shaker on Saturday morning, December 5th. The results indicated that materials in the flasks had been mixed with each other

such that, instead of having two batches, each containing only one of the two different proteins which Chapman had sought to procure, a homogeneous mixture of the two proteins had resulted. Chapman immediately realized that there may be further activities of interest on the December 4–5 tape, which he had replaced in the camera approximately an hour before. He immediately removed that tape and viewed it again.

¶ 9. The tape shows that after Chapman's assistant had placed the four two-liter flasks in the shaker on Saturday morning, Yao came to the shaker between 8:00 and 9:00 a.m. and handled them. The time-lapse tapes show Yao taking two of a Chapman student's culture tubes and mixing their contents with one of the Chapman flasks and then mixing the contents of two of Chapman's flasks together. Additionally, Yao handled two of the Chapman flasks off-camera for about five to eight seconds. The tape later shows Chapman's assistant returning after 10:00 a.m. to "induce" the flasks by adding a protein-directing agent.

¶ 10. Based on Yao's activities as shown on the tape, Chapman reported to the department chairman that Yao had been tampering with his experiments. The department chairman confronted Yao on the matter and Yao was arrested and taken into custody. Although criminal charges did not ensue, the university began proceedings to discharge Yao from his position.

¶ 11. Under applicable university regulations, Yao was entitled to an evidentiary hearing before the UW-Madison Committee on Faculty Rights and Responsibilities (CFRR). The committee conducted a hearing spanning five days in December 1999, at which Yao was represented by counsel. The university presented the videotape evidence, as well as testimony from Chapman and his research assistants regarding the problems they

had experienced earlier in 1998 and the activities as shown on the tape for December 4–5, 1998. Yao testified and he presented character witnesses, as well as an expert who testified that the results obtained by Chapman's assistant for the December 4–5 laboratory work could not have been obtained by mixing two of Chapman's flasks as Yao was observed doing on the December 5th videotape.

¶ 12. In his testimony, Yao recounted his activities as shown on the tape. He explained that he was also conducting experiments that involved placing cultures in the common equipment room shaker during the weekend in question. He claims that he placed two two-liter flasks in the shaker at around noon on Friday. The first hour of the Friday tape, however, had been recorded over on December 7th, and thus it did not show Yao placing any flasks in the shaker when he claimed to have done so. Yao also explained that when he visited the shaker on Friday evening, he was simply checking on the status of one of his cultures. He testified that although he commonly used plastic culture tubes, as did most other researchers in the lab facility, he did have some glass and stainless steel tubes like those which Chapman exclusively employed.

¶ 13. Yao also testified that his handling of the flasks in the shaker on Saturday morning was pursuant to his own work in progress, and he explained the mixing and other handling that is observed on the tape as being consistent with his experiment. Although Yao acknowledged a remote possibility that he could have mistakenly handled Chapman's flasks, he maintained that the flasks that he is observed handling and mixing on the tape were his own. He could give no explanation, however, as to why the tape showed no two-liter flasks in the shaker from its inception at about 12:40 p.m. on

Friday through the time when Chapman's assistant first placed four two-liter flasks in the shaker after 6:00 a.m. on Saturday. Yao claimed that he simply failed to observe the absence of his flasks during his Friday evening visit to the shaker because he was concentrating on the culture tubes which he handled. Yao did testify, however, that he was under considerable stress on the day in question because of the illness of one of his assistants, and because of some difficulties at home involving the health of his mother and his child.

¶ 14. The CFRR unanimously found that Yao's explanations were implausible and that he intentionally interfered with Chapman's experiments.[1] Accordingly the committee recommended to the Board of Regents that Yao be dismissed from his position for misconduct. The board accepted the committee's findings and recommendation and ordered Yao dismissed. Yao petitioned the circuit court for review under WIS. STAT. ch. 227, and the circuit court affirmed the Board of Regents' action. Yao appeals the circuit court's order.

## ANALYSIS

¶ 15. Yao claims that the board[2] should have disallowed the December 4–5 videotape evidence be-

---

[1] "The CFRR finds that the sequence of events described by Yao is inconsistent with the reasonable inferences to be drawn from the evidence presented."

[2] The Board of Regents, after considering Yao's "exceptions" and hearing oral argument on his behalf, "voted to adopt the recommended findings and decision of the CFRR." For convenience, we will most often refer only to the decision of "the board," which incorporated the CFRR's "Report, Findings and Recommendations" and is the decision under review, even though several of Yao's challenges are to matters found or decided by the CFRR.

cause of Chapman's mishandling of the tapes and the resultant gaps in tape coverage for the weekend in question. He also claims the board erred in finding that he intentionally interfered with Chapman's experiment. Specifically, Yao contends that the board ignored his expert's testimony that it would be impossible for Yao's actions as shown on the videotape to have caused the result Chapman obtained, that the board improperly discounted Yao's explanation of his actions shown on the tape, and that it did not address alleged contradictions between the tape and the testimony of one of Chapman's students.

¶ 16. Even though the appeal before us is of the circuit court's order, we independently review the board's action. *Coe v. Board of Regents*, 140 Wis. 2d 261, 268, 409 N.W.2d 166 (Ct. App. 1987). We address the videotape issue first. The board and CFRR both rejected Yao's challenge to the videotape evidence.

¶ 17. WISCONSIN STAT. § 227.45(1) provides that in administrative "contested cases," an agency is not "bound by common law or statutory rules of evidence." The statute directs agencies to "admit all testimony having reasonable probative value, but [to] exclude immaterial, irrelevant or unduly repetitious testimony." *Id*. Furthermore, "[b]asic principles of relevancy, materiality and probative force shall govern the proof of all questions of fact." *Id*. If in our review we conclude "that either the fairness of the proceedings or the correctness of the action has been impaired by a material error in procedure," we are to remand the case to the board for further action. WIS. STAT. § 227.57(4).

¶ 18. Yao claims that had significant portions of the December 4–6, 1998 tapes not been taped over (and thus erased), "they would have contained evidence that

952

would have exonerated him." He claims that the university's case against him benefited from "its own spoliation of evidence," and that standards applicable to spoliation in civil litigation should govern the. instant proceedings. Yao acknowledges that "there do not appear to be any Wisconsin cases applying the spoliation rule in the administrative law setting," but he invites us to apply the holding of *Sentry Insurance v. Royal Insurance Co.*, 196 Wis. 2d 907, 539 N.W.2d 911 (Ct. App. 1995) to the present facts. We concluded in *Sentry* that "intentional and negligent conduct" by a party in a civil suit that resulted in the failure to preserve crucial evidence was a sufficient basis for a court to impose the sanction of disallowing that party from introducing evidence relating to the destroyed item. *Id.* at 918–19 ("There is a duty on a party to preserve evidence essential to the claim being litigated.").

¶ 19. We reject Yao's arguments for several reasons. First, as we have noted, "common law or statutory rules of evidence" do not apply in administrative proceedings. Wis. Stat. § 227.45(1). Thus, a "spoliation rule" developed and applied in case law involving civil litigation does not necessarily govern the outcome here.

¶ 20. Second, whether to impose sanctions, such as disallowing certain evidence or testimony because a party has lost or destroyed evidence, is a discretionary decision on the part of the trial court, or in this case, the fact-finding agency. *See Garfoot v. Fireman's Fund Ins. Co.*, 228 Wis. 2d 707, 717, 599 N.W.2d 411 (Ct. App. 1999). Thus, even if the board might properly have excluded the tapes on the grounds Yao asserts (as we concluded in *Sentry* a trial court may do), that does not mean that the board was *required* to impose that

953

sanction. We read WIS. STAT. § 227.45 as granting an administrative fact finder at least as much discretion as a circuit court in ruling on evidentiary issues, and given that it is not bound by formal rules of evidence, we conclude that an administrative body enjoys even wider latitude than a court in admitting and considering proffered evidence.

¶ 21. Most importantly, however, we conclude that our holdings in *Sentry* and *Garfoot* are simply inapplicable to the present facts. In both cases, pre-existing physical evidence was altered or destroyed by a party to litigation (or by an expert retained by a party) at a time when litigation against identified persons or entities was imminent, or at least likely. The importance of preserving the evidence in the two cases, and the interest of an adverse party in examining it, was or should have been obvious to the sanctioned party.

¶ 22. Here, Yao "does not dispute the CFRR's finding that the tapes were not erased in an effort to affect the outcome of the case." The gaps in the videotaping for the weekend of December 4–6, 1998, came about during Chapman's investigation of suspicious happenings in his laboratory, before the university had taken any steps to dismiss Yao, and indeed, before Yao (or anyone) had even been identified as a likely suspect in the tampering. In short, unlike the refrigerator in *Sentry* and the gas piping in *Garfoot*, both of which were altered or destroyed at a time when the interest of others in preserving the items was apparent, the tapes in this case came into being only as a result of Chapman's information-gathering efforts. The gaps in coverage for the weekend in question occurred because it initially appeared as though nothing of importance had been detected. We conclude the cases on which Yao

relies do not support sanctioning the university simply because Chapman did not gather all of the information he might have.

¶ 23. Chapman's video surveillance and tape handling procedures could certainly have been better, in that he should perhaps have preserved longer continuous sequences of videotapes. But, the fact that the tapes are an incomplete record of events goes to their weight and credibility, not to whether the university should be sanctioned in the dismissal proceedings for a poorly conducted video surveillance. Yao argues here, as he did before the board, that the missing tape segments would have shown him placing two-liter flasks in the shaker on Friday, may have shown someone removing Yao's flasks, and would have confirmed that the flasks Yao manipulated Saturday morning were his and not Chapman's. These arguments serve to diminish the impact of the videotapes in supporting the university's claims, but they do not deprive the tapes of all probative value. The tapes show what they show, neither more nor less, and we conclude that the board did not err in considering them in arriving at its findings of fact.

¶ 24. We next address Yao's challenge to the sufficiency of the evidence to sustain the board's finding that Yao engaged in misconduct by intentionally manipulating his colleague's laboratory materials. WISCONSIN STAT. § 227.57(6) directs a reviewing court to proceed as follows in reviewing agency fact-finding:

> If the agency's action depends on any fact found by the agency in a contested case proceeding, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding

955

of fact. The court shall, however, set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record.

Given the statutory prohibition against a court substituting its judgment for that of an agency in the weighing of evidence on disputed facts, the standard of review mandates a considerable degree of judicial deference to the primacy of the agency's role as fact finder. Yao, however, relies on a pair of fifty-year-old precedents in an attempt to convince us to take a more rigorous approach.

¶ 25. Yao first notes that Wisconsin's Administrative Procedure Act, as originally enacted, was based on federal administrative law. He then quotes extensively from the analysis in *Universal Camera Corp. v. National Labor Relations Board*, 340 U.S. 474 (1951), where the Supreme Court considered the standard for judicial review of factual findings under the Federal Administrative Procedures and Taft-Hartley Acts. Both statutes contained similar language regarding judicial review. They required a reviewing court to set aside an agency ruling if it is based on findings which are "unsupported by substantial evidence," and "[i]n making the foregoing determinations the court shall review the whole record." *Id.* at 482 n.15.

¶ 26. The Court noted some conflict among the circuits regarding application of the "substantiality of evidence" test, and it ultimately concluded that Congress's inclusion of the direction to "consider the whole record" was a significant signal to the courts that they must do more than simply rubber stamp an agency's factual findings. *Id.* at 487–90. It then endorsed the following standard for judicial review of administrative findings:

> Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, the new legislation definitively precludes such a theory of review and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in both statutes that courts consider the whole record.

*Id.* at 487–88. Later in the opinion the Court says this:

> Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.

*Id.* at 488.

¶ 27. For the link between the *Universal Camera Corp.* holding and Wis. Stat. ch. 227, Yao relies on *Motor Transport Co. v. PSC*, 263 Wis. 31, 56 N.W.2d 548 (1953). The supreme court in *Motor Transport Co.* quotes the above passages and states, "We believe that the principles enunciated by the U.S. Supreme Court in the *Universal Camera Corp.* case are sound and are applicable to the proper interpretation of the phrase '*substantial evidence in view of the entire record*' in sec. 227.20(1)(d), Stats." *Id.* at 45 (emphasis by supreme court). The court then concludes that, given the legislature's adoption of the quoted language in 1943, "it is no longer proper for a court in reviewing the findings of an administrative agency to affirm such findings by

merely considering isolated testimony, which if standing alone, would be sufficient to sustain the findings, without considering other testimony in the record which impeaches the same." *Id.*

¶ 28. The flaw in Yao's argument that *Universal Camera Corp.* and *Motor Transport Co.* must govern our present review is that the language of the relevant Wisconsin statute changed in 1976. In Laws of 1975, ch. 414, the legislature repealed the former WIS. STAT. § 227.20(1) and replaced it with the newly created § 227.20(6) (since renumbered as WIS. STAT. § 227.57(6)), which reads: "The court shall ... set aside agency action ... if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record." Missing from the revised statute is any explicit direction that a court must "review the whole record," or that it must determine the existence of "substantial evidence in view of the entire record," which were the words in the federal and state enactments that the *Universal Camera Corp.* and *Motor Transport Co.* courts emphasized in reaching their conclusions. Moreover, the 1975 legislature added the prohibition against a court substituting its judgment for that of the agency regarding the weight of evidence on disputed findings of fact, language which is not found in the predecessor statute. *See* WIS. STAT. § 227.20 (1973–74).

¶ 29. The new language directs a court, when entertaining a challenge to an agency's finding of fact, to determine if it is "supported by substantial evidence in the record." The language, especially when coupled with the prohibition against substitution of judgment regarding weight of the evidence, plainly suggests something different than judicial consideration of "other testimony in the record which impeaches" the

958

evidence supporting the agency's finding, the standard embraced in *Motor Transport Co.* based on the former statutory language. *Motor Transport Co.*, 263 Wis. at 45. Our conclusion in this regard is bolstered by the fact that the *Motor Transport Co.* explication of "substantial evidence" has been cited as authority in a published Wisconsin appellate opinion only once since the 1976 revisions to Wis. Stat. ch. 227.[3] Discussions of the need to "view the entire record as submitted" have also

---

[3] The supreme court in *Bucyrus-Erie Co. v. DILHR*, 90 Wis. 2d 408, 280 N.W.2d 142 (1979), applying the standard for review of agency factual findings under Wis. Stat. § 227.20(6) (1977–78), affirmed a department finding challenged by the employer as having been refuted by the testimony of its medical expert. *Id.* at 424–25. The court cited *Motor Transport Co.* for the proposition that a reviewing court "must consider any impeaching or rebutting testimony in determining whether substantial evidence exists to support the agency's finding." *Id.* at 418–19. The court also noted, however, that " '[s]ubstantial evidence is not equated with preponderance of the evidence,' " and where there is substantial evidence supporting two conflicting views, " 'it is for the agency to determine which view of the evidence it wishes to accept.' " *Id.* at 418 (quoting *Robertson Transp. Co. v. PSC*, 39 Wis. 2d 653, 658, 159 N.W.2d 636 (1968). It also explained that a reviewing court "cannot evaluate the credibility or weight of the evidence." *Id.*

The only other post-1976 citations to *Motor Transport Co.* do not relate to the standard of review for agency findings of fact. *See State v. O'Connor*, 77 Wis. 2d 261, 280 n.6, 252 N.W.2d 671 (1977) (reliance on contemporaneous law review articles by sponsors or drafters of legislation); *State v. Yellow Freight Sys., Inc.*, 96 Wis. 2d 484, 490, 292 N.W.2d 361 (Ct. App. 1980) (purpose of statutory regulation of motor carriers), *aff'd*, 101 Wis. 2d 142, 303 N.W.2d 834 (1981).

disappeared, not only from the statute, but from judicial discussions of the proper standard of review under WIS. STAT. § 227.57(6).[4]

██

¶ 30. Instead, the standard which has evolved in Wisconsin case law since the enactment of the present language of WIS. STAT. § 227.57(6) was very recently summarized by the supreme court as follows:

> The test is whether, taking into account all of the evidence in the record, " 'reasonable minds could arrive at the same conclusion as the agency.' " The findings of an administrative agency do not even need to reflect a preponderance of the evidence as long as the agency's conclusions are reasonable. If the factual findings of the administrative body are reasonable, they will be upheld.

*Kitten v. DWD*, 2002 WI 54, ¶ 5, 252 Wis. 2d 561, 644 N.W.2d 649 (citations omitted). We conclude that the standard enunciated in *Kitten* governs our review, and for the reasons we have noted, the discussions in *Universal Camera Corp.* and *Motor Transport Co.* premised on different legislative language do not.[5]

---

[4] Because our review is governed by WIS. STAT. § 227.57(6) and Wisconsin precedents applying the standard it establishes, Yao's reliance on more recent federal cases reviewing administrative actions of federal agencies is also misplaced. *See Allentown Mack Sales & Serv., Inc. v. National Labor Relations Bd.*, 522 U.S. 359 (1998); *Godbey v. Apfel*, 238 F.3d 803 (7th Cir. 2000).

[5] As we have discussed, with one exception (see footnote 3), Wisconsin courts have not cited the *Motor Transport Co.* standard since the 1976 revisions to WIS. STAT. ch. 227, and we have concluded that the plain language of § 227.57(6) does not require a court to engage in extensive consideration of evidence which would support a finding other than that made by an administrative agency. Thus, it is not necessary that we consult the legislative history of Laws of 1975, ch. 414, in an attempt to

¶ 31. We thus consider whether "reasonable minds" could conclude, "taking into account all of the

ascertain whether the legislature intended that there be a change in the way Wisconsin courts review an agency's factual findings. Nonetheless, we note that the revisions were introduced as 1975 Assembly Bill 163, which originated with the Judicial Council. The Council's note regarding the changes made to what was then § 227.20 includes the following explanation:

> Section 227.20(2) is intended to continue the existing presumption of regularity of administrative proceedings and makes clear that *administrative decisions must be affirmed unless some reason is found in subs. (3) to (9) to do otherwise.*
>
> . . . .
>
> Representatives of agencies expressed the view that words such as "arbitrary or capricious" and "unsupported by substantial evidence in view of the entire record as submitted" which appear in the present act . . . are clearly understood and precisely interpreted by the courts. While agency counsel may believe this to be the case, it is not as readily apparent to many of the members of the council, especially practitioners. The language proposed here is an effort to state more clearly what seems to be intended in the more traditional language. Further, *the language is more analytical in clarifying what the approach of a reviewing court should be* and expresses in a step by step manner the process of determining the appropriate corrective action if any is warranted.

1975 A.B. 163, Judicial Council Note following section 25 (emphasis added). We find nothing in this explanation that detracts from our conclusion that, under WIS. STAT. § 227.57(6), a court must begin with an agency's finding of fact and then consult the record of the proceedings to see if it contains substantial evidence to support it, while keeping in mind that the court must not "substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact." Nothing in the language of the statute or the explanatory note which accompanied its adoption evinces a legislative intent to carry forward the *Motor Transport Co.* direction that a court must expressly consider evidence in the administrative record which "impeaches" the agency's finding.

961

evidence in the record" before the board, that Professor Yao engaged in misconduct on December 4–5, 1998, by intentionally tampering with a colleague's laboratory materials. *Kitten*, 2002 WI 54 at ¶ 5. Yao does not claim that there is no evidence in the record to support such a finding, nor does he argue that the evidence supporting the finding (the videotapes and the testimony of Chapman and his assistants) was incredible as a matter of law. Rather, Yao's complaint is that the board failed to "deal with" his own and his expert's exculpatory testimony, and with what he claims is a contradiction between the tape evidence and the testimony of a Chapman assistant. In addition to relying on the outdated *Universal Camera Corp./Motor Transport Co.* analyses, he asserts that these failings render the board's finding "unreasonable," which we agree is the proper articulation of his challenge under the applicable standard of review.

¶ 32. We have reviewed the testimony and exhibits presented to the CFRR during its five-day hearing on the university's allegations against Yao, including portions of the videotapes that were shown to the committee. We have no difficulty concluding that there was "substantial evidence" before the committee to support its finding that Yao engaged in the misconduct the university alleged on December 4–5, 1998. On the basis of the testimony of Chapman and his students, reasonable minds could readily conclude that Yao's activities as shown on the December 4–5 videotape represented unauthorized and inappropriate handling of Chapman laboratory materials, which interfered with Chapman's research objectives.

■

¶ 33. Furthermore, Yao's failure to justify his actions as mistaken or inadvertent permitted the board to

reasonably infer that Yao intentionally interfered with Chapman's work.[6] The board found that "the explanation offered by Dr. Yao for the manipulation of his colleague's materials is implausible," citing the following evidence:

31. The CFRR finds that the sequence of events described by Yao is inconsistent with the reasonable inferences to be drawn from the evidence presented. The small overnight tubes handled by Dr. Yao at 7:00 p.m. on Friday had not been there earlier in the day, and had, in fact been placed there by [a Chapman student] at approximately 5 p.m. For Dr. Yao to have placed these tubes in the shaker after the video recording ends at noon, and for the shaker nonetheless to be empty at the time the video recording began again at 12:41 p.m., would require that someone removed his tubes in that 40–minute period. In addition, the large two-liter flasks that Dr. Yao testified that he had mixed on Saturday morning were not present in the shaker at all for the 18 hours from 12:40 p.m. December 4 until 6:00 a.m. the following day. The two-liter flasks depicted on Tape #2 were not placed in the shaker by Dr.

---

[6] Although the board did not find a motive for Yao's improper activities, the record suggests several possibilities. The first is that Yao acted out of jealousy and a sense of competition with his colleague Chapman, which Yao denied. A second possible motive is Yao's pique over Chapman's continued use of the common shaker, which Yao apparently believed was "his," having so labeled it and having referred to others' use of it as "unfriendly." Finally, there is also a suggestion in the record that Yao was under various professional and domestic pressures at the time of the incident, and that this may have affected his judgment or perceptions. Motive, however, was not a necessary element of the university's misconduct allegations, and we conclude the board's finding of misconduct was reasonable even if the university failed to definitely establish Yao's motive for tampering with Chapman's materials.

Yao, but rather by Dr. Chapman's staff members. It is unlikely that—if Dr. Yao had placed his own tubes and flasks in the shaker earlier on Friday—he would not have noticed their absence when he looked into the shaker at 7:00 p.m. that evening. It is further unlikely that he would not have recognized Dr. Chapman's distinctive, stainless-steel capped overnight tubes. In addition, his laboratory notebook does not support his explanation of the experiments he testified he was doing on December 4 and 5, and his actions in mixing the contents appear inconsistent with customary care and practice in this area of research.

¶ 34. We now consider whether the board's findings are rendered unreasonable because of the failings Yao cites. His primary complaint is that the board did not discuss in its written findings the testimony of Dr. Don Cleveland, a cell biologist who had supervised Yao's postdoctoral work at the University of California. In addition to attesting to Yao's "honesty and integrity," Cleveland was asked for his opinion "whether any of the actions shown by Dr. Yao in the videotaped portions which you saw . . . could have produced" the results Chapman obtained on December 7th, and he replied, "[i]t doesn't seem so, no." Cleveland went on to explain that since Yao is seen mixing together the contents of only two of the four flasks, an even concentration of Chapman's desired proteins should not have occurred. Thus, according to Yao, the board erred in finding that Chapman's December 7th results "were consistent with the mixing of tubes and flasks as shown on the videotape, based upon their contents as reported by" Chapman's students.

¶ 35. We disagree that Dr. Cleveland's testimony exposed a fatal flaw in the university's case against Yao, or that the board could not reasonably conclude that

the Chapman results "were consistent" with what the December 4–5 tape revealed. We first note that Dr. Cleveland was far from an impartial witness, given that he acknowledged he had a high regard for Yao and that he questioned the UW's pursuit of these allegations. Moreover, his testimony was not altogether unequivocal in support of Yao. Cleveland acknowledged that one researcher's unauthorized handling of another's laboratory materials, as Yao is shown doing on the tape, would be "some cause for concern." Cleveland also responded that had he, like Yao, visited the shaker on Friday evening and found it did not contain his flasks and marked tubes, he would have been "surprised, bewildered." Finally, Cleveland also responded affirmatively to questions from a CFRR member, who posited an alternative explanation of the result Chapman obtained on December 7th which included, as one step, the mixing of two flasks as Yao was observed doing on the tape.

¶ 36. Moreover, we note that Chapman testified in rebuttal that his December 7th laboratory result was consistent with Yao's actions on the videotape if: (1) labels were switched on the two flasks which Yao is not seen to mix but which he took off-camera for about eight seconds; or (2) labels had been switched on the overnight culture tubes before their contents were transferred to the flasks. In short, we conclude that Dr. Cleveland's testimony is not the smoking gun Yao would have it be, and that the testimony does not render the board's finding unreasonable.

¶ 37. Next, Yao argues that the board improperly discounted, or even "ignored," his testimony that he was working on an experiment of his own on December 4–5, 1998. We agree with the board, however, that the fact

that Yao may have had an experiment of his own in progress that weekend does not diminish the reasonableness of the board's conclusions regarding the implausibility of his explanation of his actions as observed on the tape. That is, the board adequately expressed its reasons for not accepting Yao's explanation, none of which are diminished by the fact that Yao may truly have also had an experiment of his own in progress. The board, based on the videotapes and the testimony from Chapman and his assistants, rejected Yao's assertion that the tape showed him handling and mixing his own materials, not Chapman's.

¶ 38. Finally, Yao argues that the tape demonstrates that the flasks Chapman's student placed in the shaker at around 6:00 a.m. Saturday, contrary to his testimony, were actually Yao's two-liter flasks, and that the board failed to discuss this "indisputable videotape evidence." Yao asserts that this student held a grudge against him for not sponsoring the student for employment, and Yao not so obliquely suggests that this student was actually the laboratory saboteur.

¶ 39. We note first that the student's actions on the videotape are not necessarily in conflict with his testimony that the four flasks he placed in the common shaker contained cultures from four of the overnight tubes involved in Chapman's experiments. The fact that this student also transferred cultures to a number of other flasks, to which he also testified, and that he is seen on the tape taking other flasks elsewhere, does not render incredible his testimony that the four flasks he placed in the common shaker were Chapman's.

¶ 40. In order to accept Yao's assertion that the tapes more logically support his theory of what happened, we would first have to accept Yao's theory, which

the board rejected. Although the tapes do not rule out Yao's version of events, his is not the more logical version as he asserts, in that it fails to explain why Yao did not detect the absence of his flasks from the shaker when he twice visited it on Friday evening, nor why Chapman's student would return to "induce" the four flasks in the common shaker if he knew that they were in fact not Chapman's flasks but Yao's. Finally, we note that Yao, in neither his opening statement nor his closing argument before the CFRR, articulated his theory that the student's handling of flasks as shown on the Saturday morning videotapes support Yao's claim that he handled his own and not Chapman's flasks. It is thus neither surprising nor unreasonable for the committee and the board not to have discussed this alternative view of the evidence.

¶ 41. In closing, we note that we do not underestimate the devastating impact the board's findings and decision will have on what Yao several times refers to as his promising career as a scientist, researcher and university professor. The serious consequences of a "just cause" dismissal are one reason why university regulations prescribe a rigorous process when accusations such as those against Yao are made. The board had before it the unanimous findings and recommendation of a faculty committee composed of nine of Yao's faculty peers, the CFRR, which had conducted a lengthy evidentiary inquiry into the university's allegations over a five-day period. During these proceedings, Yao was represented by two able and experienced litigators, who also argued Yao's case before a committee of the board.

¶ 42. The CFRR, the board committee and ultimately the board itself, considered Yao's legal and factual challenges to the university's proposed dismissal for cause. Unfortunately for Dr. Yao, these bodies found

his explanations incredible, and the videotapes and testimony of Chapman and his assistants convincing, with respect to Yao's actions on December 4 and 5, 1998. Although we accept Yao's assertion that the board's finding that he engaged in misconduct is at odds with his past record of achievement and integrity, we cannot conclude on this record that the board's finding "is not supported by substantial evidence in the record." WIS. STAT. § 227.57(6). Accordingly, we affirm the circuit court's order affirming the board's action.

*By the Court.*—Order affirmed.