In the

# United States Court of Appeals
## For the Seventh Circuit

No. 16-2982

SABINA BURTON,

*Plaintiff-Appellant,*

*v.*

BOARD OF REGENTS OF THE UNIVERSITY OF WISCONSIN SYSTEM,
et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 14-cv-274 — **James D. Peterson**, *Judge.*

ARGUED JANUARY 19, 2017 — DECIDED MARCH 17, 2017

Before FLAUM, MANION, and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* Sabina Burton, a professor in the criminal justice department at the University of Wisconsin-Platteville, sued the school's Board of Regents and three individual defendants. She claims that her superiors took several retaliatory actions against her over the course of about two years. She seeks relief under Title VII of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972.

The district court granted summary judgment to the Board and the individual defendants. For the reasons set forth below, we affirm the judgment of the district court.

## I. Background

In 2009, Dr. Burton was hired as a tenure-track professor in the criminal justice department at the University of Wisconsin-Platteville. In January 2012, she was promoted to associate professor. Later that year, a series of events began to unfold that eventually led to this litigation.

First, in October 2012, Burton received a complaint from a student in her department who claimed that another professor had sexually harassed her. The student was upset that the professor had handed her a note during class that read "call me tonight!" and included the professor's phone number. The next day, Burton contacted the Dean of the College of Liberal Arts (which encompasses her department), Elizabeth Throop, regarding the alleged harassment. Burton then spoke with her department chair, Thomas Caywood, who broached the subject with the offending professor.

The professor who wrote the note claimed that it was part of a "breach experiment," or an intentional provocation designed to display to the class social norms by violating them. The student, however, took it seriously. In any event, Burton told Caywood that she thought all faculty members should be made aware whenever a professor conducts such an experiment, but Caywood didn't think that was necessary. A week later, Caywood circulated a memo to the department that altered the procedure for reporting student complaints about faculty members: professors were now to bring students' complaints directly to Caywood, rather than going outside of

the department. The next month, Caywood said at a department meeting that the change was necessary because someone had overreacted by bringing a student complaint outside the department. Overall, Caywood became less collegial towards Burton, and she viewed the change in departmental policy as a direct repudiation of her conduct.

Around the same time, Throop and Caywood began to withdraw their support for a cybersecurity curriculum that Burton had been developing. In April 2012, Burton submitted (and Caywood signed) a grant application to the National Science Foundation in an attempt to receive funding for the creation of a cybersecurity curriculum at the University. That application was rejected, but Burton eventually received a modest offer from AT&T of $7,000 to fund the cybersecurity program.

Caywood and Throop hampered this process after Burton had reported the alleged harassment of the student in October 2012. Specifically, in November Caywood failed to respond to Burton's request for a meeting about the grant process. Then on January 24, 2013, both Throop and Caywood objected to the wording in a draft press release prepared by the AT&T representative. In an email chain that included Burton and the AT&T representative, Throop and Caywood expressed their concerns that the press release said too much because Burton had yet to submit formally any course curricula to the appropriate University committees. Caywood also confronted Burton about inaccuracies (which Caywood had never noticed before) on two websites that Burton had created for the proposed cybersecurity program. Nevertheless, Throop and the

AT&T representative ironed out the language of the press release and Burton received the grant the next day in a public ceremony attended by the provost of the University.

In the midst of this, in January 2013 Burton submitted her application for tenure. It was unanimously granted two months later. Although Caywood had initially opposed Burton's application, he eventually voted in her favor. Caywood then stepped down as department chair after the 2012–13 academic year, seemingly in part because of conflict with Burton. He was replaced by Michael Dalecki, but Burton's troubles did not end there.

On August 13, 2013, Burton filed a charge of discrimination with the Wisconsin Department of Workforce Development – Equal Rights Division (ERD). In it, Burton alleged that (1) Caywood had discriminated against her because of her sex and retaliated against her for reporting the note incident; (2) both Throop and the University's human resources director (to whom Burton had sent an email complaining of Caywood's retaliation) had discriminated against her; (3) Throop had defamed her (in connection with the AT&T press release); and (4) the University had been deliberately indifferent to her grievances. After she filed that charge, Dalecki and others pressured her on multiple occasions to drop her case. Burton was told that she might have been considered for the positions of dean or department chair, but that she could not expect to advance if she continued to engage in litigious behavior.

On April 14, 2014, Burton filed her initial complaint in this case in the Western District of Wisconsin, alleging both discrimination and retaliation. Then on October 20, 2014, she completed an intake questionnaire with the United States Equal Employment Opportunity Commission (EEOC). Four

days later, Throop sent Burton a "letter of direction" which identified seven events that Throop considered examples of inappropriate behavior by Burton.[1] Throop's letter included five specific directions for Burton to follow. Burton, however, rejected the directions and accused Throop of mischaracterizing the facts. Afterwards, Throop filed a complaint against Burton with the chancellor of the Board of Regents pursuant to Wis. Admin. Code UWS § 6.01, asking for a formal letter of reprimand. It is unclear from the record whether this complaint has been resolved.

Finally, on December 4, 2014, Throop accused Burton of canceling class without permission. In response, Burton sent an email to all of her students documenting her issues with Throop and Caywood and asking for the students' help in proving that she had in fact held class on that day. When the students responded that class had occurred, Throop did not discipline Burton. The next day, Burton filed her EEOC charge. She filed the second amended complaint in this case on September 11, 2015, and the district court granted summary judgment to the Board on March 18, 2016.[2] Burton timely appealed.

---

[1] As Burton conceded at oral argument, the record does not show that Throop or anyone else at the University was aware of the intake questionnaire when the letter of direction was issued.

[2] In her response to the defendants' motion for summary judgment below, Burton dismissed all of her original claims except for retaliation claims under Title VII and Title IX. She also apparently pursues claims only against the Board of Regents, so we will refer to the defendants simply as the Board.

## II. Analysis

### A. Standard of Review

We review the district court's decision to grant summary judgment to the Board *de novo*. *Brunson v. Murray*, 843 F.3d 698, 704 (7th Cir. 2016). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view all evidence in the light most favorable to Burton, who was the party opposing the motion below. *Brunson*, 843 F.3d at 704. The Board is entitled to summary judgment if Burton cannot present sufficient evidence to create a dispute of material fact regarding any essential element of her legal claims on which she bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### B. Title VII and Title IX Framework

Both Title VII of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 permit plaintiffs to bring causes of action for retaliation. See 42 U.S.C. § 2000e-3(a) (Title VII); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–74 (2005) (Title IX). The elements of those claims are the same: Burton must produce enough evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected activity; (2) the Board took a materially adverse action against her; and (3) there existed a but-for causal connection between the two. *Milligan v. Bd. of Trs.*, 686 F.3d 378, 388 (7th Cir. 2012); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013) (causation standard).

### C. Waiver of Certain Arguments

One threshold matter that we must address is Burton's attempt to inject more facts into the case on appeal than she presented to the district court. Burton claims that the district court erred by limiting its analysis to certain alleged protected activities and materially adverse actions. She says that if the district court had considered everything, it would have found that she engaged in more protected activities and suffered more significant adverse employment actions.

Burton's problem is that she did not make these broad arguments to the district court. For example, on the Title IX claim she argues that the district court should have considered a litany of potential materially adverse employment actions. Yet she presented only two to the district court: Caywood's reaction to her reporting of the note incident and Caywood's and Throop's supposed withdrawal of support for her cybersecurity curriculum. Throughout her briefing, Burton relies on facts that appear nowhere in her opposition to the Board's motion for summary judgment below. It appears that she made a strategic decision in the district court to focus on the strongest points in her case and omit the rest.

That decision was not necessarily a bad one, but it does preclude her reliance here on the facts omitted below. For one, she had the burden of identifying protected activities and materially adverse actions in opposition to summary judgment before the district court. See *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 649 (7th Cir. 2011). The district court was necessarily limited to arguments presented in Burton's opposition brief. After all, "a lawsuit is not a game of hunt the peanut. Employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are 'obliged in our

adversary system to scour the record looking for factual dis-
putes … .'" *Greer v. Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001)
(quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921–22
(7th Cir. 1993)).

Instead, "[i]t is a well-settled rule that a party opposing a
summary judgment motion must inform the trial judge of the
reasons, legal or factual, why summary judgment should not
be entered." *Liberles v. Cook Cty.*, 709 F.2d 1122, 1126 (7th Cir.
1983). "If [the nonmoving party] does not do so, and loses the
motion, it cannot raise such reasons on appeal." *Id.* This rule
prevents Burton from raising specific factual arguments that
were absent from her briefing below even though her general
claims were plainly before the court. See *Fednav Int'l Ltd. v.
Cont'l Ins. Co.*, 624 F.3d 834, 841 (7th Cir. 2010) ("[A] party has
waived the ability to make a specific argument for the first
time on appeal when the party failed to present that specific
argument to the district court, even though the issue may
have been before the district court in more general terms.").
Thus, Burton is limited to the facts laid out in Part I above and
to the particular protected activities and adverse actions that
she argued below. We now proceed to the merits of her Title
IX and Title VII claims.

### D. Title IX Claim

The Board concedes on appeal that Burton's actions in re-
porting the allegedly inappropriate in-class note were pro-
tected activities under Title IX. As Burton did not raise any
further protected activities below, we move on to assess
whether any alleged actions by Burton's superiors in the wake
of the note incident were materially adverse to her. As noted
above, Burton raised two potential adverse actions: (1) the
supposed criticisms of Burton after she reported the note; and

(2) the apparent withdrawal of support for Burton's cybersecurity initiative.

First, we emphasize that "[n]ot everything that makes an employee unhappy is an actionable adverse action." *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1106 (7th Cir. 2012) (quoting *Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009)). Rather, "an adverse action is one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Silverman v. Bd. of Educ.*, 637 F.3d 729, 740 (7th Cir. 2011) (citations and internal quotation marks omitted); see also *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 729 (7th Cir. 2009). In other words, it does not include "those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

Like the district court, we conclude that neither of Burton's proffered adverse actions rises to the level of materiality necessary to form the basis of a Title IX retaliation claim. With respect to the post-note criticism, the record does not support Burton's claims. Caywood never expressly denounced the way Burton handled the situation. Instead, he merely presented a new policy for handling similar problems in the future. Even if we were to construe Caywood's rollout of the new policy as an implicit reprimand, that would not be sufficient to be a materially adverse action either. See *Chaib v. Indiana*, 744 F.3d 974, 987 (7th Cir. 2014), overruled on other grounds by *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). As in *Chaib*, there was no showing that any reprimand (or any lack of collegiality on the part of Caywood) caused any subsequent consequences for Burton's employment. See

also *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 602 (7th Cir. 2009) ("[W]ritten reprimands without any changes in the terms or conditions of [an employee's] employment are not adverse employment actions."). Indeed, Burton unanimously received tenure just months after the incident.

The same is true of the disagreement over the cybersecurity program at the University. The most the record shows is that Throop and Caywood were concerned that the language of the AT&T press release may have been over-representing the progress of the cybersecurity curriculum that Burton had been developing, and that Caywood was concerned about some errors on websites that Burton had created. Yet Throop approved the press release the same day that the dispute began, and Burton received the AT&T grant in a public ceremony attended by the provost and vice chancellor of the University. Once again, Burton received tenure within months of this incident and can point to no material consequences resulting from it. While she may have perceived that Throop and Caywood had retaliated against her, these actions simply do not rise to the level of a materially adverse employment action protected by Title IX. Therefore, like the district court, we need not engage in any causation analysis. The district court correctly granted summary judgment to the Board on the Title IX retaliation claim.

### E. Title VII Claim

With respect to the Title VII claim, the Board concedes both that Burton undertook protected activities (filing charges with the Wisconsin ERD and the EEOC and filing this lawsuit) and was subjected to materially adverse employment actions (Throop's letter of direction and subsequent complaint to the

chancellor).[3] Burton didn't raise any other protected activities below, so she has forfeited the chance to do so now. But she did present two further adverse actions to the district court: (1) the repeated pressuring by Dalecki and others to drop the discrimination charges; and (2) Throop's threat of discipline in retaliation for the allegedly canceled class on December 4, 2013. The district court properly concluded that the pressure to drop the suit could not have amounted to a materially adverse action because these statements "did not cause [Burton] any injury." *Dunn v. Washington Cty. Hosp.*, 429 F.3d 689, 692 (7th Cir. 2005).[4] For a similar reason, unfulfilled threats of discipline related to the accusation that Burton canceled class are not actionable. See *Poullard v. McDonald*, 829 F.3d 844, 856–57 (7th Cir. 2016) (recognizing that unfulfilled threats are not materially adverse actions for the purpose of a Title VII retaliation claim).

So we are left with the task of determining whether the record contains enough evidence for a reasonable jury to conclude that the admitted protected activities were the but-for cause of the admitted adverse actions. Without direct evi-

---

[3] We follow the parties' briefing in presenting the claims separately under Title IX and Title VII. The parties appear to agree that the facts surrounding the in-class note incident would not state a Title VII claim because of the lack of employment relationship between Burton and the reporting student. We need not consider whether they are right, because the elements of a Title VII and Title IX retaliation claim are the same.

[4] Even the comments noting that Burton could have been dean or department chair material if she were not so litigious don't amount to an adverse action. There is no indication that Burton ever sought those positions or that she was otherwise under consideration apart from the stray comments. In other words, the comments caused Burton no injury.

dence of causation, Burton must rely on circumstantial evidence like suspicious timing, ambiguous statements, treatment of similarly-situated employees, and any other relevant information that could permit an inference of retaliation. *See Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 869 (7th Cir. 2013). It's also true that actions that were not in and of themselves materially adverse, such as unfulfilled threats, may still be evidence of retaliatory motive for actionable actions. *Poullard*, 829 F.3d at 857. But the dispositive question remains whether a reasonable jury could find a but-for causal link between the protected activities and adverse actions at issue. And because the Board has presented non-retaliatory reasons for Throop's conduct, the true question is whether the proffered reasons were pretext for retaliation. See *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 539 (7th Cir. 2013).

We agree with the district court on this point as well. First, the timing of the letter of direction is not suggestive of retaliatory motive. The last potential protected activity here was the filing of this lawsuit in April 2014, six months before Throop sent the letter of direction. Burton has not provided any evidence that bridges the significant time gap between her final protected activity and Throop's adverse action.[5]

---

[5] Moreover, as the district court noted, "Throop sought and obtained an equity adjustment to Burton's salary in March 2014." *Burton v. Bd. of Regents*, 171 F. Supp. 3d 830, 846 (W.D. Wis. 2016). This occurred between the filing of Burton's ERD charge and the initial complaint in this case. Such positive intervention in between two instances of protected activity at least somewhat undermines Burton's retaliation theory. See *Albrechtsen v. Bd. of Regents*, 309 F.3d 433, 437–38 (7th Cir. 2002).

While the six-month gap does not preclude Burton's claim as a matter of law, it does substantially weaken it.[6]

Moreover, the record demonstrates that Throop had a factual basis for each of the allegations she leveled against Burton in the letter of direction, and Burton failed to provide evidence that the allegations were pretextual. Indeed, the district court stated that Burton did not dispute the truth of the allegations, only "how Throop *perceived* and *characterized* those events, and whether Throop should have accepted Burton's explanations for each of them." *Burton*, 171 F. Supp. 3d 846. These are exactly the type of personnel management decisions that federal courts do not second-guess. We intervene only where "an employer's reason for [an adverse action] is without factual basis or is completely unreasonable." *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 646 (7th Cir. 2013). This is plainly not such a situation. Burton has not presented sufficient evidence of pretext, and as a result she cannot establish but-for causation.

There is no evidence in the record that Throop's complaint against Burton was retaliation for her protected activity, but there is evidence that Burton decided not to heed any of the "direction" contained in the letter. Then, as now, Burton

---

[6] As indicated in Part I, Burton conceded at oral argument that the record does not indicate that Throop or anyone else at the University knew that Burton had completed an intake questionnaire with the EEOC four days before the letter of direction issued. This gap in the record is particularly harmful to Burton's claim, because in order to be liable for Title VII retaliation, "the employer must have had actual knowledge of the protected activity" at issue. *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009). Without evidence establishing actual knowledge, the timing of the intake questionnaire is irrelevant.

simply argues that Throop should never have written the letter. But once again, pretext "involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Harden v. Marion Cty. Sheriff's Dep't*, 799 F.3d 857, 864 (7th Cir. 2015) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008)). There is no evidence that either the letter of direction or Burton's subsequent complaint were such lies. No reasonable jury could find that either the letter of direction or the subsequent complaint were caused by Burton's protected activities, rather than legitimate disagreements between Burton and Throop. Therefore, the district court properly granted summary judgment to the Board on Burton's Title VII claim.

## III. Conclusion

Professor Burton undoubtedly feels that she has been treated unfairly by some of her superiors at the University because she reported alleged harassment and proceeded with this case. Yet the record does not support her claims. During the relevant period, Burton was granted tenure by a unanimous vote and the University held a public ceremony celebrating Burton's receipt of a grant from AT&T. Dean Throop even sought an upward salary adjustment for her after she had brought a charge with the Wisconsin ERD. Burton's frustrations may be significant, but they do not amount to actionable retaliation under either Title VII or Title IX. Therefore, the district court correctly granted summary judgment to the Board.

AFFIRMED.