In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-2544

EDWARD L. YOUNGMAN,

*Plaintiff-Appellant*,

*v.*

PEORIA COUNTY, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:16-cv-01005-JBM-JEH — **Joe Billy McDade**, *Judge.*

ARGUED SEPTEMBER 11, 2019 — DECIDED JANUARY 24, 2020

Before RIPPLE, ROVNER, and BARRETT, *Circuit Judges*.

ROVNER, *Circuit Judge.* Edward Youngman was placed on medical leave from his job with the Peoria County Juvenile Detention Center after he informed his supervisor that he could no longer work shifts in the facility's control room. Youngman had rarely worked in the control room during his tenure with the detention center, but when changes in job

rotations had resulted in his temporary assignment to the
control room, he experienced headaches, nausea, and dizzi-
ness, among other symptoms. Youngman asked that he not be
assigned to the control room in the future as an accommoda-
tion, but was told that was not possible; he was instructed that
he could return to work if and when his condition improved.
After Youngman's leave time expired, his position was filled,
and he found employment elsewhere, he filed this suit under
the Americans with Disabilities Act, alleging that his employer
had refused to accommodate his disability and forced him out
of his position. The district court granted summary judgment
to the defendants, reasoning that Youngman was responsible
for the breakdown of the interactive process required by the
ADA. *Youngman v. Kouri*, 2018 WL 3186920 (C.D. Ill. June 28,
2018). We affirm, but on a different ground.

## I.

Youngman worked as a youth counselor at the Peoria
County Juvenile Detention Center beginning in 1998; as such,
he was technically an employee of the Chief Judge of the local
circuit court. Youth counselors at the detention center are
responsible for the supervision, care, safety, and counseling of
the juveniles detained at the 63-bed facility.

Youngman was diagnosed with a pituitary tumor and
acromegaly in 1993 and had surgery to remove the tumor and
a portion of his pituitary gland the following year. He subse-
quently had a thyroidectomy in 2011, resulting in both
hypothyroidism and hypocalcemia.

After another youth counselor complained in 2010 about
unfair job assignments at the detention center, an investigation

was conducted and it was recommended that the center's superintendent, Brian Brown, review the rotation of assignments. Brown would later take the position that every youth counselor needed to be trained in and rotated through all three assignments at the detention center: (1) control room, (2) living units, and (3) floaters. Up until that time, assignments had not been made equally, and it was common knowledge that not all youth officers knew how to perform the duties associated with all three assignments. Youngman himself had only worked in the control room on 10 to 14 occasions over the course of his 13 years at the detention center. Beginning in 2012, all youth counselors on the first shift (which Youngman worked) were required to work in the control room for at least one or two weeks annually, to ensure they could perform the duties in that post.

Youngman was assigned to work in the control room for the week of July 29, 2012, although he was not told that this was for training purposes and would only be a temporary assignment. As Youngman describes it, the control room at that time was packed with electronic equipment that emitted various humming, beeping, or buzzing noises and required the operator to make rapid turning movements in order to monitor multiple video screens, some of which displayed multiple camera feeds from around the detention center. Youngman began to experience severe headaches, nausea, dry heaves, dizziness, and pain that radiated up and down his neck and head. He took a sick day on July 31, and returned to work on August 1 with a note from his physician, Dr. Jacob Doering, indicating that he could not work in the control room due to

medical concerns. Brown requested further information from Youngman, advising him that Doering's note was too vague.

Youngman worked the remainder of the week in the control room, taking two hours of sick leave on August 2. He was then placed on light duty which, ironically, entailed reassignment to the control room, where he worked from August 5 through 9. On August 5, Youngman provided a follow-up note from Dr. Doering indicating that Youngman was experiencing motion sickness due to the lights, noise, cameras, and televisions in the control room and that Youngman should not be assigned to work in that room.[1] Youngman also provided a written statement of his own indicating that although he was capable of performing all duties required in the control room, he experienced the symptoms described above in that assignment due to the confined space of the room coupled with the large amount of electronics and the activities and noise associated with them. Youngman requested assignment to the living units or security unit (a living unit for juveniles on lockdown status) of the detention center or, alternatively, that he be assigned as a floater.

Brown ordered Youngman to undergo a fitness for duty examination with the county's physician, Dr. Dru Hauter. Hauter examined Youngman and concluded that he could only return to work with restrictions: specifically, he said that Youngman could not view multiple television or monitor screens, must avoid rapid alternating movements and flashing

---

[1] Consistent with Dr. Doering's diagnosis, we, like the parties, shall treat the motion sickness Youngman experienced when assigned to the control room as the relevant limitation on Youngman's ability to work.

lights, and could not engage in commercial driving. Absent such restrictions, Dr. Hauter indicated, Youngman posed an imminent risk of injury to himself or others.

After consulting with human resources personnel, Brown and another detention supervisor advised Youngman that he was being placed on medical leave until his condition improved. Youngman asked if he could just not be assigned to the control room, but Brown told him that was not possible. Neither party proposed an alternative accommodation. In connection with Youngman's medical leave, Youngman and Doering completed paperwork reaffirming that Youngman was not capable of working in the control room. Youngman commenced leave under the Family and Medical Leave Act on September 6, 2012. Youngman submitted monthly reports from Doering indicating that his condition had not changed.

In February 2013, the county advised Youngman that his FMLA leave time had expired and that his position would be filled, but that when he was able to return to work, he would be placed in the first available opening most comparable to his previous position. In February 2013, Youngman filed a charge of discrimination with the Illinois Department of Human Rights ("IDHR"), alleging *inter alia* that he had been forced onto medical leave due to his disability and that his employer had failed to accommodate that disability. He filed a parallel charge with the federal Equal Employment Opportunity Commission ("EEOC").

In April 2013, Youngman obtained a new job elsewhere and stopped submitting monthly updates to Peoria County. That led to a series of warnings that he was not in compliance with

medical leave requirements and needed to submit appropriate documentation of either his ongoing disability or his readiness to return to work and/or meet with Brown. Youngman did neither; on September 29, 2013, he notified the county by fax that he was resigning his employment, to the extent he was still considered to be an active employee. Youngman's resignation was not accepted: on October 1, 2013, Brown notified him that he was discharged for insubordination.

Shortly thereafter, an IDHR investigator issued recommended findings concluding that substantial evidence supported Youngman's allegations that the Chief Judge (as his nominal employer) had failed to accommodate his disability and instead had forced him onto medical leave. The EEOC in turn issued a finding of reasonable cause to believe that the Chief Judge had discriminated against Youngman in violation of the ADA on the same grounds. It thereafter issued Youngman a notice of his right to bring suit against his former employer.

Youngman proceeded to file suit under the ADA contending that the Chief Judge had not accommodated his disability; and ultimately the district court entered summary judgment in favor of the Chief Judge. Judge McDade concluded that the trier of fact could find that Youngman had a cognizable disability (hypothyroidism) that substantially interfered with a major life activity (his endocrine functioning). 2018 WL 3186920, at *8–*9. Judge McDade also concluded that Youngman was a qualified individual who could perform the essential duties of a youth counselor at the juvenile detention facility. *Id.*, at *11. He found that the evidence was mixed as to whether working in the control room for more than one or two

weeks of the year (for training purposes) was essential, and noted that Youngman had submitted evidence that he *could* work in the control room on an emergency basis and had, in fact, worked in the control room successfully for nine days before he was placed on medical leave. *Id.*

But Judge McDade determined that Youngman was responsible for the breakdown of the interactive process required by the ADA to determine whether his disability could be accommodated. *Id.*, at \*13–\*14. He reasoned that (1) Youngman did not provide his employer with the necessary clarifications concerning his medical restrictions to permit a determination of what, if any, accommodation was possible, and (2) while on medical leave, Youngman ultimately stopped sending updates on his condition to his employer and refused to appear for a meeting with Superintendent Brown. *Id.*, at \*13–\*14. Consequently, "no reasonable trier of fact could hold the Chief Judge liable for failing to provide reasonable accommodations to Youngman." *Id.*, at \*14.

## II.

We review the entry of summary judgment in favor of the Chief Judge de novo, construing the evidence in the light most favorable to the non-movant, in this case Youngman. *See Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 694 (7th Cir. 2017). The Chief Judge was entitled to summary judgment so long as Youngman failed to present evidence sufficient to create a dispute of material fact on any essential (and contested) element of his claim as to which he bears the burden of proof. *See id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986)). Because our review is de

novo, we can affirm on any ground fairly presented below and supported by the record. *Costello v. Grundon*, 651 F.3d 614, 636–37 (7th Cir. 2011).

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discrimination can take the form of treating a disabled employee differently from other workers or failing to make reasonable accommodations to the known limitations of the employee. *See* § 12112(b); *e.g.*, *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019). Youngman is pursuing a failure-to-accommodate claim. To prevail on such a claim, Youngman must show (1) he was a qualified individual with a disability, (2) his employer was aware of his disability, and (3) the employer failed to reasonably accommodate his disability. *E.g.*, *Rowlands v. U.P.S. - Ft. Wayne*, 901 F.3d 792, 798 (7th Cir. 2018).

When a qualified employee has requested an accommodation, the ADA requires both parties to engage in an informal interactive process to identify an appropriate accommodation, 29 C.F.R. § 16302(*o*)(3); *e.g.*, *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 292 (7th Cir. 2015), and as noted above, Judge McDade found that Youngman had failed to provide the necessary clarifications regarding his limitations and ultimately abandoned the interactive process altogether when he ceased providing status reports and did not respond to his employer's inquiries and requests to meet while on leave. 2018 WL

3186920, at *13–*14. But we believe that Youngman's claim fails on a more basic point.

The statute, as we have said, prohibits an employer from "discriminat[ing] against a qualified individual with a disability *on the basis of* disability[.]" § 12112(a) (emphasis ours). It follows that the failure to accommodate a disabled employee's particular limitation amounts to discrimination "on the basis of disability" only if the limitation is caused by the disability. *See Arnold v. County of Cook*, 220 F. Supp. 2d 893, 896 (N.D. Ill. 2002). Put a different way, there must be "some causal connection between the major life activity that is limited and the accommodation sought." *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 785 (7th Cir. 2007); *see also Desmond v. Mukasey*, 530 F.3d 944, 959 (D.C. Cir. 2008) (Rehabilitation Act); *Nuzum v. Ozark Auto. Distribs., Inc.*, 432 F.3d 839, 848 (8th Cir. 2005); *Felix v. New York City Transit Auth.*, 324 F.3d 102, 106–07 (2d Cir. 2003).

As we have noted, Youngman had a portion of his pituitary gland and the entirety of his thyroid gland removed, and as a result of his thyroidectomy, he suffers from both hypothyroidism and hypocalcemia, which in turn require him to take medication and dietary supplements. A physical or mental condition must substantially limit one or more major life activities in order to qualify as a disability under the ADA. 42 U.S.C. § 12102 (1) & (2); 29 C.F.R. § 1630.2(j)(1)(ii). The district court, noting that diseases like diabetes which affect the functioning of the body's endocrine system qualify as disabilities, concluded that Youngman's hypothyroidism should be treated in the same way. 2018 WL 3186920, at *9. The Chief

Judge contests that conclusion, but for present purposes, we may assume that it is correct.

The problem, for Youngman, is the lack of a causal nexus between his hypothyroidism and the particular limitation for which he seeks an accommodation. Youngman presumes that the motion sickness he suffers when assigned to the detention center's control room is the result of his hypothyroidism. But he cites no evidence in the record to support that necessary causal link.

Youngman's physician, Dr. Doering, was questioned on this point during his deposition. Doering unequivocally stated that he knew of no connection between motion sickness and acromegaly, hypothyroidism, hypocalcemia, or the medications and supplements Youngman was taking to treat his hypothyroidism and hypocalcemia. R. 34-32, Doering Dep. 17–18, 33–37, 42–44. Although Youngman's counsel indicated at oral argument that Doering had posited a causal link between hypothyroidism and motion sickness in the notes he had submitted to the detention center on Youngman's behalf, our own review of the notes reveals no such suggestion. (We may set aside the fact that Youngman withdrew his designation of Doering as his own expert). The only evidence we can find in that vein is Youngman's own statement that when he was examined by Doering on August 2, 2012, Doering told him, "The medical conditions you have and the disabilities you have can be exacerbated by certain stimuli." R. 37-15, Youngman Dep. 122. But Dr. Doering's out-of-court statement to Youngman amounts to hearsay which is beyond the limited exception set forth in Federal Rule of Evidence 803(4) for statements that patients make to their physicians for purposes

of medical diagnosis or treatment. *See Bombard v. Ft. Wayne Newspapers, Inc.*, 92 F.3d 560, 564 (7th Cir. 1996); *accord, Field v. Trigg Cnty. Hosp., Inc.*, 386 F.3d 729, 735–36 (6th Cir. 2004); *Stull v. Fuqua Indus., Inc.*, 906 F.2d 1271, 1273–74 (8th Cir. 1990); *Bulthuis v. Rexall Corp.*, 789 F.2d 1315, 1316 (9th Cir. 1985) (per curiam). Youngman has pointed to no other evidence from any other medical expert positing a causal link between hypothyroidism and motion sickness.[2]

Without proof that his motion sickness is caused by a condition that qualifies as a disability under the ADA, Youngman cannot show that his employer discriminated against him on the basis of that disability. As that is an essential element of his ADA claim, the detention center was entitled to summary judgment.

**III.**

The district court properly granted summary judgment in favor of the defendant. Assuming that Youngman has a cognizable disability, he failed to offer evidence indicating a

---

[2]  Below and on appeal, Youngman has cited the MERCK MANUAL and various other medical publications as evidence that certain of the individual adverse symptoms he experienced while working in the control room (headache and nausea, for example) could be explained by his underlying medical conditions or the medications he took to address them. *See, e.g.,* R. 37 at 18–22 ¶ 52. But these sources do not establish, so far as we can discern, a link between Youngman's conditions and/or medications and the constellation of symptoms comprising *motion sickness*, which is the particular limitation that Dr. Doering cited as the reason why Youngman could not work in the control room.

causal nexus between that disability and the particular limitation (motion sickness) for which he sought an accommodation.

AFFIRMED