COURT OF APPEALS
DECISION
DATED AND FILED

September 2, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP2276**

Cir. Ct. No. **2018CV218**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

---

SABINA LEIGH BURTON,

   PETITIONER-APPELLANT,

V.

THE BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM,

   RESPONDENT-RESPONDENT.

---

APPEAL from an order of the circuit court for Grant County: ROBERT P. VAN DE HEY, Judge. *Affirmed*.

Before Blanchard, P.J., Kloppenburg, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Dr. Sabina Leigh Burton appeals a circuit court order affirming, on judicial review under WIS. STAT. ch. 227, the decision of the Board of Regents of the University of Wisconsin System (the Board) terminating her employment as a tenured professor at the University of Wisconsin-Platteville (UWPL). *See* WIS. STAT. ch. 227 (2019-20).[1] Burton argues that: (1) the Board's findings underlying its determination of just cause for termination are not supported by substantial evidence; (2) the Board applied the wrong burden of proof; (3) the Board misconstrued the legal standard for dismissal; (4) the Board denied Burton her right to confront and cross-examine witnesses; and (5) the Board infringed on her academic freedom. We reject her arguments and therefore affirm.

## BACKGROUND

¶2 In 2012, while Burton was a non-tenured associate professor in the UWPL Department of Criminal Justice (the department), a student told Burton that a department instructor had given the student a note that read, "call me tonight!!," with the instructor's telephone number. Burton informed the UWPL administration. The UWPL administration verbally reprimanded the instructor and, sometime later, UWPL did not renew the instructor's teaching contract. Burton took the position that the incident had not been adequately addressed, and she continued to raise concerns about the instructor's actions and the administration's response. Although Burton was awarded tenure in 2013, she

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted. The relevant statutory provisions have not changed since the Board's June 2018 decision.

identified this incident as marking the point at which her relationships with colleagues and UWPL administrators began to deteriorate.

¶3 On October 28, 2014, Dr. Elizabeth Throop, then-Dean of the UWPL College of Liberal Arts and Education, sent Burton a "letter of direction" regarding her "unprofessional and concerning interactions with [her] campus colleagues." The stated purpose of the letter was to "describe some of the specific incidents that have caused [Throop] concern and [to] give [Burton] directions about [Throop's] expectation[s] for [Burton's] future behavior." The letter set forth five "directions" and stated that "failure to follow these directions will likely result in disciplinary action." Burton responded by email, "I am sorry, but I cannot accept your letter of direction.… I have filed a grievance against you concerning your letter of direction and look forward to resolving the issues soon." Also in 2014, approximately six months before Throop's letter of direction, Burton filed a federal lawsuit against the University of Wisconsin System, asserting that UWPL had taken retaliatory actions against her over the course of about two years. *See Burton v. Board of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 692, 694 (7th Cir. 2017). Burton's complaint was dismissed on summary judgment, and the dismissal was upheld on appeal. *See id.* at 694, 698. A subsequent federal lawsuit that Burton filed against UWPL was also dismissed by the district court. *See Burton v. Board of Regents of Univ. of Wis. Sys.*, 17-CV-36-JDP (W.D. Wis. Sept. 4, 2020).[2]

---

[2] The subject matters and procedural details of these lawsuits do not matter to any issue in this appeal; they are mentioned as background only because of their significance in the timeline of disputes between Burton and her colleagues.

¶4  On June 3, 2016, UWPL Chancellor Dennis Shields sent Burton another letter of direction regarding what he alleged was continued "unprofessional and concerning" conduct. The Chancellor's letter directed Burton to "cease using University resources to harass, intimidate or threaten your co-workers and supervisors." This letter, like the previous one, warned Burton "that violation of these directions may result in disciplinary action."

¶5  On December 16, 2016, Throop (by that time UWPL Interim Provost) and UWPL Interim Dean Melissa Gormley filed a complaint with Chancellor Shields seeking Burton's dismissal. The complaint alleged that Burton secretly recorded confidential meetings at which tenured faculty decided personnel issues, such as tenure matters, and that she and her husband posted audio files and transcripts of the recordings on "universitycorruption.com," a website they maintained. The complaint further alleged that Burton had "repeatedly intimidated and harassed her co-workers" and "failed to comply with the [letters of] direction" from UWPL administrators to stop this behavior.

¶6  Chancellor Shields determined that these allegations, if proven, might lead to dismissal, and he appointed Dr. Petra Roter, of UW System Administration, to investigate. *See* WIS. ADMIN. CODE § UWS 4.02(1) (May 2021)[3] (the chancellor "shall … initiate an investigation" upon receiving a complaint about a faculty member that the chancellor "deems substantial and which, if true, might lead to dismissal"). By letter dated March 4, 2017, Burton

---

[3] All references to the Wisconsin Administrative Code are to the May 2021 Register. Neither party suggests that pertinent administrative code provisions have changed in any material respect since the Board's June 2018 decision that is the subject of review in this appeal.

received a completed copy of a report of the investigation by Dr. Roter, which determined that Burton engaged in the conduct alleged in the complaint.

¶7    On March 30, 2017, Chancellor Shields wrote a letter to Burton setting forth a "Statement of Charges" and finding just cause for Burton's dismissal. Burton exercised her right under WIS. ADMIN. CODE § UWS 4.04 to request an administrative hearing to challenge her dismissal. In the meantime, UWPL placed Burton on paid administrative leave. A UWPL standing faculty committee held an evidentiary hearing over the course of three days in 2017: May 25, September 19, and November 30. *See* WIS. ADMIN. CODE § UWS 4.03 (a faculty committee at each UW institution shall act as the hearing agent for the Board on dismissal cases). Chancellor Shields, Interim Provost Throop, and three of Burton's colleagues testified in support of Burton's dismissal. Burton testified in her defense. The committee also considered the parties' documentary evidence, including emails that Burton had sent to UWPL employees.

¶8    On December 14, 2017, the faculty committee issued a written decision concluding that there was just cause for dismissal based on two of the charges in the March 30 statement of charges. Specifically, the committee found that Burton intentionally recorded faculty meetings and caused recordings to be published on the internet, and that this constituted a knowing violation of the "reasonable expectation of privacy associated with sensitive personnel discussions at department meetings." The committee also found that "[t]he expectation of privacy in the faculty appointment and tenure review process is standard practice in university settings, including at the [UWPL]" and that "[t]he process of peer review is at the center of faculty governance."

¶9      Regarding the second charge, the committee found that Burton had "engaged in disrespectful, harassing, and intimidating behavior towards [her] colleagues in an attempt to undermine them professionally and damage their reputation and careers," and that Burton's actions "impaired the efficient and effective operation of the workplace." The committee unanimously recommended dismissal, concluding that there was "just cause" to dismiss Burton. *See* WIS. ADMIN. CODE § UWS 4.01(1) (a tenured UW faculty member may be dismissed only for "just cause").

¶10      Chancellor Shields, agreeing with the faculty committee's decision, wrote a letter recommending Burton's dismissal to Ray Cross, President of the University of Wisconsin System. President Cross referred the matter to the Board's Personnel Matters Review Committee (PMRC). Following briefing and oral argument before the PMRC, the PMRC unanimously determined that there was just cause for Burton's termination. The chair of the PMRC reported the PMRC's findings and decision to the Board, and the Board voted to adopt the findings and decision of the PMRC and to terminate Burton's employment. *See* WIS. ADMIN. CODE § UWS 4.01(1) (only the Board may dismiss a tenured faculty member). In June 2018, the Board issued a written decision ordering Burton's dismissal. Burton petitioned the circuit court for judicial review. The circuit court affirmed the Board's decision, and Burton appeals.

## STANDARD OF REVIEW

¶11      On appeal from a circuit court's review of a final agency decision, we review the agency's—not the circuit court's—decision. *Yao v. Board of Regents of Univ. of Wis. Sys.*, 2002 WI App 175, ¶16, 256 Wis. 2d 941, 649 N.W.2d 356. We independently determine questions of law, but we accord

considerable deference to the agency's factual findings. WIS. STAT. § 227.57(6), (11); *Wisconsin Bell, Inc. v. LIRC*, 2018 WI 76, ¶¶29-30, 382 Wis. 2d 624, 914 N.W.2d 1. We will not substitute our own views on disputed facts or evidentiary weight for those of the agency, and we will affirm the agency's findings so long as they are supported by substantial evidence. Sec. 227.57(6); *Wisconsin Bell*, 382 Wis. 2d 624, ¶30. "Substantial evidence does not mean a preponderance of the evidence. It means whether, after considering all of the evidence of record, reasonable minds could arrive at the conclusion reached by the trier of fact." *Milwaukee Symphony Orchestra, Inc. v. DOR*, 2010 WI 33, ¶31, 324 Wis. 2d 68, 781 N.W.2d 674. If substantial evidence supports a determination, we must affirm, "even though the evidence may support a contrary determination." *Von Arx v. Schwarz*, 185 Wis. 2d 645, 656, 517 N.W.2d 540 (Ct. App. 1994).

## DISCUSSION

¶12 As stated, Burton argues that substantial evidence does not support her dismissal for just cause. She also argues that the Board: (1) applied the wrong burden of proof, (2) misconstrued the legal standard for dismissal, (3) denied Burton her right to confront and cross-examine witnesses, and (4) infringed on her right to academic freedom. We reject each of Burton's arguments for the reasons explained below.

### I. Substantial Evidence Supports the Board's Findings Underlying its "Just Cause" Determination

¶13 Tenured faculty may be dismissed only for "just cause." WIS. ADMIN. CODE § UWS 4.01(1). "Just cause" exists when a tenured governmental employee's conduct "can reasonably be said to have a tendency to impair [the employee's] performance of the duties of [the employee's] position or the

efficiency of the group with which [the employee] works" or is "so substantial, oft repeated, flagrant, or serious that [the employee's] retention in service will undermine public confidence in the [employer's] service." *Safransky v. Personnel Bd.*, 62 Wis. 2d 464, 474, 215 N.W.2d 379 (1974) (internal quotation marks and quoted source omitted). For conduct to "have a tendency to impair" job performance or group efficiency, there must be "a rational nexus … between conduct complained of and its deleterious effects." *Id.* (internal quotation marks and quoted source omitted). "Only if the employee's misconduct has sufficiently undermined the efficient performance of the duties of employment will 'cause' for termination be found." *Id.* at 475.

¶14 Applying the above-quoted standards from *Safransky*, the Board determined that there was just cause for Burton's dismissal. Specifically, the Board based its dismissal on the following two findings: that Burton recorded confidential personnel discussions and caused these discussions to be posted on the internet, which "breached the trust and reasonable expectations of [UWPL] for its faculty;" and that Burton's behavior towards her colleagues was "intimidating, harassing, and disruptive," which "impaired the ability of [the] department to pursue its mission and serve its students." As we now explain, substantial evidence supports these findings.[4]

---

[4] Burton occasionally appears to direct some of her arguments to the circuit court's decision or the procedures the circuit court used in review, but we do not address whatever errors she may mean to attribute to the circuit court because, as stated, we review only the Board's decision. *See Yao v. Board of Regents of Univ. of Wis. Sys.*, 2002 WI App 175, ¶¶16-17, 256 Wis. 2d 941, 649 N.W.2d 356 (WIS. STAT. ch. 227 review is of the agency's decision).

## A. Confidential personnel discussions

¶15     As to the first charge, the Board found that Burton "shared personnel information of colleagues which breached the trust and reasonable expectations of [UWPL] for its faculty," including "reasonable expectations of professionalism and privacy." The Board further found that, "[w]hile there is no assertion that Burton violated the law, it is reasonable [for UWPL] to expect that personnel discussions, particularly regarding junior faculty members, will not be recorded and posted publicly on the internet." We conclude that these findings are supported by substantial evidence.

¶16     Burton acknowledged in her testimony that she secretly recorded meetings at which tenured faculty discussed personnel issues, such as merit pay, faculty performance, tenure awards, and junior faculty evaluations. Burton further acknowledged that her husband, with her knowledge, posted recordings of these discussions on a public website that he created, along with transcripts of the meetings that Burton edited.

¶17     Turning to evidence about the significance of that conduct and its bearing on the just cause standard, UWPL witnesses testified that it was generally understood among faculty that such personnel discussions were to be kept confidential. For example, Interim Provost Throop testified that she had worked at several large state academic institutions in different administrative roles and that "[w]e all understand that deliberations regarding probationary faculty are confidential. It's a national norm." Chancellor Shields testified that Burton had a "professional obligation" not to disclose performance evaluations publicly and that it "was a gross violation of professional ethics to publish the personnel evaluations of junior faculty members."

9

¶18      UWPL witnesses testified that the internet publication of this information significantly impaired the functioning of the department as a whole. For example, Chancellor Shields testified that Burton's actions "undermine[d] the trust that is necessary for … faculty to make informed, candid decisions about the performance and qualifications of faculty," including "decisions on the promotion and tenure of their colleagues." Interim Provost Throop testified that Burton's activity undermined "an effective system of shared [university] governance." Dr. Staci Strobl, then-department chair, testified that Burton's online publishing had a negative, direct effect on day-to-day departmental governance:

> It got to the point where the department couldn't hold a meeting because folks were not talking about anything. I pride myself on [having] transparent conversation about issues that are important to the department. This … couldn't be done.… [P]eople were feeling like "I am just going to sit here and not say anything because this is going to be recorded and it's going to be up on social media for the world to listen to[.]"

¶19      Burton challenges the Board's findings on this charge by arguing that "[t]here was no statutory, regulatory, or other legality binding on Burton that would make those meetings [she recorded and disclosed publicly] confidential." But Burton does not cite authority for the proposition that "just cause" for dismissal requires that an employee break the law. As noted above, the Board expressly acknowledged that "there is no assertion that Dr. Burton violated the law" in connection with the recordings. Rather, the Board found that Burton's actions violated reasonable expectations of professionalism and privacy. As discussed above, those findings are supported by the record.

¶20      Burton further contends that speakers at the meetings did not have reasonable expectations of confidentiality because the meetings were open, per Wisconsin's open meetings law. *See* WIS. STAT. §§ 19.81-19.98. Burton does not

provide a citation to the record for her assertion that the faculty personnel discussions that she recorded and publicly disclosed were held in open session. Burton also fails to discuss or even acknowledge potentially applicable open meetings exemptions, such as WIS. STAT. § 19.85(1)(b) and (c), which permit closed sessions for meetings concerning "the grant or denial of tenure for a university faculty member" and the "employment, promotion, compensation or performance evaluation data of any public employee." Simply put, Burton has not shown how the open meetings law bears on the direct allegation against her: that her actions violated professional norms and her colleagues' reasonable expectations of privacy.

¶21    We conclude that substantial evidence supports the Board's finding that Burton violated UWPL's reasonable expectations of privacy, professional norms, and her colleagues' trust by recording personnel discussions and causing them to be posted on the internet.

B.  Intimidating, harassing and abusive conduct

¶22    As to the second charge, we conclude that the collective testimony of the UWPL witnesses, together with the documentary evidence, supports the Board's finding that Burton engaged in a pattern of intimidating, harassing, and abusive conduct towards her colleagues, and its finding that this behavior impaired the functioning of the department. The evidence shows that this behavior began in 2012 and escalated in intensity and frequency, especially worsening after Burton's 2014 federal suit was dismissed. Interim Provost Throop testified that emails she received from Burton "became more and more unprofessional, [and] more and more hectoring," with Burton "making accusations about all of her colleagues, none of which were true." She testified that Burton's conduct toward various

colleagues was "unprofessional," "insulting," and "bullying." Strobl, the former department chair, testified that Burton's conduct caused colleagues to "suffer[] immensely." Burton particularly bullied and "impugn[ed] the integrity" of junior faculty, on several occasions threatening their tenure prospects.

¶23 The evidence presented included numerous emails that Burton sent to her colleagues, often copying other UWPL employees not involved with the matter at issue. As an example, UWPL Interim Provost Throop testified that UWPL was fortunate to secure as a member of its academic staff a nationally recognized policing expert. Burton, however, sent that person an email chastising him for "referring to [himself] as a faculty member" and "mispresent[ing]" himself "as [Burton's] equal at this university."

¶24 Moreover, there was evidence that Burton regularly posted allegations against the UWPL administration, and false and inflammatory statements about her colleagues, on her website and on social media platforms. These included allegations, "with no basis in fact," that various colleagues were racist, sexist, and "criminal," and engaged in "illegal behavior." Burton also disseminated such content to various media outlets, including a website that regularly featured her disseminations. The Board also had an evidentiary basis to find that UWPL administrators counseled Burton on how to change her behavior, that she received two letters of direction to that effect (as discussed above), but that she did not change her behavior, instead stating explicitly to then-Dean Throop that she would not comply with the directives.

¶25 UWPL witnesses testified to the profoundly negative effect that Burton's behavior had on their ability to perform their jobs and properly manage and govern the department. As examples, Interim Provost Throop testified that, as

Burton's behavior escalated over time, "there seemed to be something every week that happened, so that there were weeks when I was spending 20 hours a week trying to manage Dr. Burton and the upset that she was causing." Strobl similarly testified that, when she was department chair,

> I couldn't get my job done…. I was spending my entire day talking to students, faculty and staff, coaching them, mentoring them, commiserating with them [about Burton's emails and online activity]…. [I] literally could not get through a to-do list for three weeks.

Strobl testified that she eventually decided that she could not keep her department employees "personally" or "professionally []safe" from Burton, and as a result, resigned her position as chair. Strobl also testified that she herself felt personally unsafe; as Burton's behavior escalated, she began to fear that Burton would commit an act of "workplace violence."

¶26 As specifically relating to the "just cause" dismissal standard, there was further evidence that Burton's behavior had a negative effect on the functioning of the department as a whole. For example, Interim Provost Throop testified that, just before Burton was placed on administrative leave,

> faculty members and academic staff members were either not coming in [to their campus offices] because they feared having to interact with Dr. Burton or they were closing their doors and locking them, so that meant that … they were not as available to students as they wanted to be … because they were scared of what she was going to do next.

Throop also testified that, once Burton had left the department, it "has been incredibly productive…. They're much more relaxed." Strobl testified that, when she was chair, students regularly came to her to express anxiety or unhappiness because Burton had told them that UWPL did not protect students against sexual harassment. In Strobl's view, Burton was not accurately representing UWPL's

harassment policies and, instead, was drumming up "group hysteria." One of Burton's colleagues, Dr. Cheryl Banachowski-Fuller, described an atmosphere of fear and gridlock: "[e]verybody … was professionally threatened," "several people … felt physically threatened," and it was a "nightmare" to attempt to conduct routine departmental business. Chancellor Shields testified that the department "simply is unable to function with Sabina Burton present." For all these reasons, the Board had substantial evidence to support its finding that "[d]epartment members could not engage in even the most minor of academic business with Burton without fear of coming under her constant drumbeat of accusations."

¶27 Burton argues that the evidence does not show that her behavior rose to the level of "intimidating, harassing, or disruptive." In effect, she asks this court to reweigh the evidence and to substitute her view for the Board's. But that is not our role, *see Wisconsin Bell*, 382 Wis. 2d 624, ¶30, and we must affirm where substantial evidence supports the Board's decision, *see Von Arx*, 185 Wis. 2d at 656.

¶28 In sum, we conclude that substantial evidence supports the Board's findings as to both charges and that these findings support the Board's determination that there was just cause for Burton's dismissal.

## *II. The Board Did Not Commit Legal or Procedural Error*
## *Compelling Reversal, Modification or Remand*

A. The Board applied the correct burden of proof

¶29    Burton argues that the Board applied a burden of proof lower than the "clear and convincing evidence" standard, which Burton views as the proper evidentiary standard for determining whether there is "just cause" for dismissal.[5]

¶30    In its decision dismissing Burton for "just cause," the Board articulated the burden of proof as "clear preponderance of the evidence," noting that it had applied that standard "in its most recent faculty termination cases."[6]  In support of applying this burden of proof, the Board relied on ***Reinke v. Personnel Board***, 53 Wis. 2d 123, 191 N.W.2d 833 (1971), a case also involving the dismissal of a public employee but predating the particular regulations at issue here.  In ***Reinke***, our supreme court, in addressing the proper burden of proof to be used by the Personnel Board, concluded that, unless governing law provides otherwise, "the required burden of proof is that of other civil cases, that the facts be established to a reasonable certainty by the greater weight or clear preponderance of the evidence."[7]  ***Id.*** at 137.

---

[5] Neither party discusses, and we do not address, how the issue of whether the Board applied the proper burden of proof affects our review on appeal, which, as set forth in the text above, is whether substantial evidence supports the Board's findings.  Instead, we assume without deciding that it could matter to our review if the Board relied on an incorrect burden of proof in its decision.

[6] The Board did not clarify how long it had been employing this burden of proof standard in faculty termination cases or, in particular, whether this practice predated the creation of pertinent language in WISCONSIN ADMIN. CODE ch. UWS 4.

[7] Neither party argues that the qualifier "clear" in the ***Reinke*** "clear preponderance of the evidence" standard indicates that ***Reinke*** prescribes (or the Board applied) the "clear and convincing evidence" burden of proof.  *See **Reinke v. Personnel Board***, 53 Wis. 2d 123, 137, 191

(continued)

¶31 In arguing that the higher "clear and convincing evidence" standard applies, Burton relies primarily on WISCONSIN ADMIN. CODE ch. UWS 4, establishing procedures for the dismissal of faculty members. Chapter 4 defines two burdens of proof—"clear and convincing evidence" and "preponderance of the evidence." *See* WIS. ADMIN. CODE § UWS 4.015(1), (7). WISCONSIN ADMIN. CODE § UWS 4.06(1)(am) states that the lower "preponderance of the evidence" standard applies to dismissal proceedings "[f]or complaints involving sexual harassment, sexual assault, dating violence, domestic violence, sexual exploitation, or stalking." Burton argues that, by inference, the higher "clear and convincing evidence" burden of proof applies in all other dismissal proceedings because "specifying the lower preponderance of the evidence standard" for proceedings involving the conduct delineated in § UWS 4.06(1)(am) "would be pointless unless the standard is normally higher." She argues that we must construe the provisions of WIS. ADMIN. CODE ch. UWS 4 so as not to render any language superfluous. *See **Town of Cedarburg v. Dawson***, 2004 WI App 174, ¶13, 276 Wis. 2d 206, 687 N.W.2d 841 (we construe regulations in the same

---

N.W.2d 833 (1971). The Board argues that it applied the correct "preponderance of the evidence" standard. Burton argues that the Board applied either the *incorrect* "preponderance of the evidence" standard or some "conflated" third standard. Although we need not decide this issue, we note that the standard articulated in **Reinke** appears to reflect the "preponderance of the evidence" burden of proof, despite the use of the qualifier "clear." *See **id.*** at 137 & n.5 (citing WIS JI—CIVIL 200, "Burden of Proof: Ordinary," for the proposition that "the standard to be used by the Personnel Board in making its findings should be that used in ordinary civil actions, to a reasonable certainty, by the greater-weight-of-the-credible-evidence standard"); **Carlson & Erickson Builders, Inc. v. Lampert Yards, Inc.**, 190 Wis. 2d 650, 657-58, 529 N.W.2d 905 (1995) ("In most civil cases the lower, ordinary burden of proof applies; the jury is told that a party has the burden to satisfy the jury to a reasonable certainty by the greater weight of the credible evidence."); **Town of Schoepke v. Rustick**, 2006 WI App 222, ¶11, 296 Wis. 2d 471, 723 N.W.2d 770 (identifying, with citation to **Carlson**, this "lower burden of proof" as "the preponderance of the evidence standard, which requires the litigant to demonstrate by the greater weight of credible evidence the certainty of his or her claim").

manner as statutes, to give effect to every word and avoid surplusage when possible).

¶32     WISCONSIN ADMIN. CODE § UWS 4.06 does not specify the burden of proof to be applied in proceedings *not* involving the conduct delineated in § UWS 4.06(1)(am) ("complaints involving sexual harassment, sexual assault, dating violence, domestic violence, sexual exploitation, or stalking.").   In fact, WIS. ADMIN. CODE ch. UWS 4 mentions the term "clear and convincing evidence" only twice—to define it and to contrast that standard with the "preponderance of the evidence" standard.   *See* § UWS 4.015(1) (defining "clear and convincing evidence"); § UWS 4.015(7) (defining "preponderance of the evidence" and noting that it "is a lower standard of proof than 'clear and convincing evidence'"). The chapter is therefore ambiguous, because one (but not the only) reasonable inference is the one Burton draws—that the default burden of proof is "clear and convincing evidence."    Given that ***Reinke*** does not address these particular provisions, we turn to extrinsic sources, namely, regulatory history, to determine if this inference is the most reasonable.   *See **State ex rel. Kalal v. Circuit Ct. for Dane Cnty.***, 2004 WI 58, ¶¶45-50, 271 Wis. 2d 633, 681 N.W.2d 110 (the court may rely on extrinsic sources to discern the meaning of an ambiguous provision).

¶33     In 2016, the Board amended WIS. ADMIN. CODE ch. UWS 4 to add both the "clear and convincing evidence" definition and § UWS 4.06(1)(am), the provision applying the "preponderance of the evidence" standard in dismissal proceedings "[f]or complaints involving sexual harassment, sexual assault, dating violence, domestic violence, sexual exploitation, or stalking."    The Board explicitly stated that its purpose in making these amendments was to align the rules with United States Department of Education (DOE) guidance interpreting Title IX of the Education Amendments of 1972.  *See* 726A1 Wis. Admin. Reg. CR

No. 15-061 (June 6, 2016), *available at* https://docs.legis. wisconsin.gov/code/register/2016/726A1/register/cr/cr_15_061_rule_text/cr_15_061_rule_text (last visited Aug. 18, 2021). But it is entirely unclear what the Board intended to accomplish in defining "clear and convincing evidence" as a burden of proof, when it failed to explain when that standard is to be applied.

¶34 However, the Board adopted the amendments against the backdrop of a default burden of proof in "just cause" dismissal proceedings, namely, "preponderance of the evidence." *See e.g.*, **Reinke**, 53 Wis. 2d at 137 ("[i]f there is no statutory counterpart, the required burden of proof" for the Personnel Board's "just cause" determination "is that of other civil cases"). In other words, while the amendments are ambiguous, it seems unlikely that the Board would have deviated from the established default burden of proof in this context without providing clear direction that it was doing so.

¶35 Aside from the 2016 amendments to WIS. ADMIN. CODE ch. UWS 4 discussed above, Burton does not identify, and we have not located, any other potential authority mandating a higher burden of proof in ch. UWS 4 dismissal proceedings.[8] Accordingly, we conclude that the Board applied the correct

---

[8] Burton points to *McAdams v. Marquette University*, 2018 WI 88, ¶36, 383 Wis. 2d 358, 914 N.W.2d 708, in which Marquette University applied the "clear and convincing evidence" standard in dismissing a faculty member. As Burton acknowledges, however, the proceeding in *McAdams* was in accordance with the Marquette University Faculty Statutes (which requires the clear and convincing standard), not WIS. ADMIN. CODE ch. UWS 4. *See id.* Burton also argues that the clear and convincing standard conforms to the standard recommended by the American Association of University Professors (AAUP). We may not adopt a standard recommended by the AAUP that we have concluded has not been adopted by our legislature or the Board, nor substitute that recommendation for the standard articulated in *Reinke*—a case addressing the discharge of a public employee for just cause.

preponderance of the evidence burden of proof to Burton's just cause determination.

## B.  The Board applied the correct "just cause" standard for dismissal

¶36    Burton implies that the Board did not apply the *Safransky* "just cause" standard, summarized above.[9]  This argument is difficult to reconcile with the multiple references to *Safransky* in the Board's decision, including in its conclusion that "just cause" supported dismissal.  In Burton's view, however, the *Board* did not apply *Safransky* because, at the evidentiary hearing, Chancellor Shields and UWPL's counsel articulated purportedly incorrect "instructions" of "just cause" to the *faculty committee*.

¶37    Chancellor Shields told the faculty committee,

> [T]he question for you in your recommendations is whether you think what has transpired here rises to the level of a violation of the trust and the orderly evaluation of faculty … [and] rises to the level where this [behavior] crosses a line, warranting … the termination of tenure for this faculty member.

UWPL's counsel told committee members, "The standard of dismissal that … the Board of Regents uses for termination of a tenured faculty member is whether that

---

[9] In her brief-in-chief, Burton quotes the *Safransky* "just cause" standard with approval, arguing that the Chancellor failed to apply this standard in his testimony before the committee. *See Safransky v. Personnel Bd.*, 62 Wis. 2d 464, 215 N.W.2d 379 (1974).  In her reply brief, however, Burton changes course and argues that the *Safransky* "just cause" standard does not apply to dismissals of UW tenured professors because Wis. Admin. Code § UWS 4.01(2) guarantees UW faculty the right to academic freedom.  We do not address this latter argument because it is both undeveloped, *see State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992), and because it is raised for the first time in her reply brief, *see Tele-Port, Inc. v. Ameritech Mobile Commc'ns, Inc.*, 2001 WI App 261, ¶10 n.2, 248 Wis. 2d 846, 637 N.W.2d 782.

faculty member is engaged in behaviors that impair the efficient functioning of the university." We construe Burton to argue that these statements are incorrect either because they do not quote *Safransky* verbatim or because they do not include the language in *Safransky* that the employee's misconduct must "sufficiently undermine[]" job performance. *See Safransky*, 62 Wis. 2d at 474-75.

¶38     There are multiple problems with Burton's argument. First, contrary to Burton's assertion, the remarks of Chancellor Shields and counsel are not akin to jury instructions. Second, the content of these remarks, although not following the language from *Safransky* verbatim, is not contrary to the *Safransky* standard. Third, Burton registered her objection to the remarks of counsel after the first hearing and had the opportunity to supply the committee with the standard that she believed was correct. Finally, Burton does not explain why any alleged error was relevant to the *Board's* decision-making.

¶39     Accordingly, Burton fails to show that the Board applied an incorrect legal standard for "just cause."

C. The Board did not deny Burton the right to confront and cross-examine witnesses

¶40     Burton's next argument centers on the fact that Burton was not present at the first day of her evidentiary hearing. She contends that this denied her the right to confront and cross-examine adverse witnesses, as provided by WIS. ADMIN. CODE § UWS 4.05(1)(e).[10] Burton glosses over the fact that she was not

---

[10] Although Burton summarily states that her absence on the first day of the committee's evidentiary hearing violated her due process rights, she does not develop (and we therefore do not address) any constitutional claim. *See Pettit*, 171 Wis. 2d at 646. To the extent that Burton intends to raise a due process claim, it rests solely on her assertion that she was denied the right to confront and cross-examine witnesses in violation of WIS. ADMIN. CODE § UWS 4.05(1)(e), an argument that we address and reject in the text.

present at the hearing because she chose not to attend it. She claimed then and now that she was ill at the time. The faculty committee, by proceeding with the hearing, rejected this explanation and implicitly agreed with UWPL's counsel that Burton "has been trying to postpone this hearing ever since it was scheduled" and "has used every possible excuse that she can to try and get out of it."

¶41 The decision to postpone a trial or hearing is discretionary. *See Rechsteiner v. Hazelden*, 2008 WI 97, ¶28, 313 Wis. 2d 542, 753 N.W.2d 496. Here, the record supports the committee's decision to proceed with the hearing despite Burton's failure to appear.

¶42 Four days before the hearing, Burton filed a request with the committee to "reconstitute the appeal panel in accordance with policy," and, correspondingly, she requested a continuance. At that time, Burton requested several changes to the hearing format, including that the committee: provide her with as much time to as she needed to present evidence, which "may take a few months"; limit each hearing to half a day because of the impact of stress on her "severe medical condition" (an ulcer); and provide a week between each hearing day to allow her to recover from the stress that she said she anticipated experiencing. Burton stated that she "become[s] very stressed at the thought of facing an appeal panel whose strings are being pulled by" counsel for the UWPL and that "[f]acing a kangaroo court is more stressful than facing a fair court." Burton did not provide any medical evidence with this request. UWPL's counsel took the position that the lack of such evidence should be considered in light of the fact that Burton "asserts that she has suffered from this ulcer condition for a number of years" and, presumably, had a treating physician.

¶43 The committee chair denied Burton's request for a continuance and for reconstitution of the panel.[11] On the first day of the hearing, Burton did not appear. Burton's husband appeared and stated that Burton "was sick because the hearing panel had failed to follow process." Burton's husband did not provide specific information on Burton's medical condition and "left before his information could be put on the record."[12] Given these arguably dilatory tactics, we cannot conclude that the committee erroneously exercised its discretion in proceeding as scheduled.

¶44 In any event, Burton cannot meet her burden of showing that the "claimed procedural error is prejudicial." *See Responsible Use of Rural & Agr. Land (RURAL) v. PSC*, 2000 WI 129, ¶48, 239 Wis. 2d 660, 619 N.W.2d 888; *see also* WIS. STAT. § 227.57(4) (remand is warranted only when the error in agency procedure is material). UWPL offered to send Burton a transcript and video of the first day of the hearing so that she could demonstrate which witnesses might need to be recalled and why. UWPL further offered to arrange for telephonic appearances of recalled witnesses who might not be available in person. The Board noted that, "other than Chancellor Shields, Burton made no attempt to recall any of [the UWPL] witnesses for cross examination during the two additional days of hearing that were held." Burton does not meaningfully explain why, with these accommodations for the remainder of the hearing, "either the

---

[11] The committee complied with some other portions of Burton's request, in that each of the three hearing days was no more than three hours in length and each was more than a week apart, occurring on May 25, September 19, and November 30, 2017.

[12] UWPL's counsel summarized the above in a letter to the standing committee and Burton does not dispute the accuracy of this description. Burton eventually provided a medical note, but not until approximately one week after the first day of the hearing. Therefore, the Board could not take this note into consideration in weighing Burton's postponement request.

fairness of the proceedings or the correctness of the [decision] was impaired." *See RURAL*, 239 Wis. 2d 660, ¶48.

¶45    In sum, Burton fails to show that she was denied the right to confront and cross-examine witnesses.

D.  The Board's decision did not violate Burton's academic freedom

¶46    Burton argues that the Board's decision does not comport with WIS. ADMIN. CODE § UWS 4.01(2), which guarantees her right to academic freedom. WISCONSIN ADMIN. CODE § UWS 4.01(2) provides, in part:

> A faculty member is entitled to enjoy and exercise all of the rights and privileges of a United States citizen, and the rights and privileges of academic freedom as they are generally understood in the academic community.  This policy shall be observed in determining whether or not just cause for dismissal exists.

To support her position that the Board's decision is contrary to this rule, Burton relies on *McAdams v. Marquette University*, 2018 WI 88, 383 Wis. 2d 358, 914 N.W.2d 708.  In that case, a tenured Marquette University professor brought a breach of contract action against the university after he was dismissed for cause. *Id.*, ¶1.  He argued, and our supreme court agreed, that the conduct supporting his dismissal was protected by the safeguard of academic freedom articulated in the university's faculty handbook. *Id.*, ¶¶62-64, 77.  *McAdams* was a civil case "narrowly focused" on interpreting and applying Marquette University's definition of academic freedom, which is not at issue here. *See id.*, ¶62.

¶47    Even assuming that WIS. ADMIN. CODE § UWS 4.01(2) embodies a definition of academic freedom comparable to that in the Marquette handbook, the conduct at issue in *McAdams* is in no way analogous to Burton's.  The question in

that case was whether McAdams could be dismissed for posting a blog entry criticizing a university instructor's teaching methods, which he viewed as prohibiting the free exchange of ideas in the classroom. *McAdams*, 383 Wis. 2d 358, ¶7. The blog post contained links to the instructor's publicly available contact information and website. *Id.* The post relied in part on a "surreptitious recording" that a student made of the instructor, which McAdams also distributed to media outlets after his post gained national attention. *Id.*, ¶¶8, 73, 75. As a result of this attention, the instructor received "strongly-worded and offensive communications … from third parties, including some that expressed violent thoughts." *Id.*, ¶8.

¶48 The issue before the court was whether the blog post "clearly demonstrate[d]" McAdams's "unfitness for his … position." *Id.*, ¶¶67, 77. The court's conclusion, that McAdams's conduct was protected by the academic freedom policy, relied on circumstances not present here. McAdams's post was an analysis of the instructor's actions in the context of McAdams's stated view that academia generally suffers from "leftist" biases. *Id.*, attachment following ¶96. It was "certainly critical of" the instructor, but "it ma[de] no ad hominem attack … nor d[id] it invite readers to be uncivil to her, either explicitly or implicitly." *Id.*, ¶76. Some of the third-party responses to the post were admittedly "vile[]," but the court concluded that McAdams could not reasonably have expected or intended the post to elicit offensive remarks. *Id.* In contrast, the evidence here shows that the Board had a reasonable basis to determine that Burton regularly posted disparaging and inflammatory content, with no basis in fact, on her website and social media. Moreover, Burton's online posting was only a partial basis for the Board's conclusion that there was just cause for Burton's dismissal. The

Board also found that Burton targeted her colleagues in person and through email in an intimidating, harassing, and disruptive manner.

¶49 Burton further argues that her acts of recording and publishing confidential meeting content are akin to—and should be protected to the same extent as—McAdams's use of the student/instructor meeting recording. But the Board's determination of "just cause" on this charge centered on Burton's breach of confidentiality and the negative consequences on departmental governance. These circumstances were not present in *McAdams*. *See id.*, ¶75.[13]

## CONCLUSION

¶50 For all of these reasons, we affirm the circuit court order affirming the Board's dismissal of Burton for just cause.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[13] Burton relatedly argues that the Board's decision violated her First Amendment rights. Because she raises this issue for the first time in her reply brief, we do not address it. *See Tele-Port*, 248 Wis. 2d 846, ¶10 n.2.

The fact section of Burton's brief-in-chief implies that UWPL committed various other procedural errors, both before and during her evidentiary hearing. Because the argument section does not develop these points, we do not address them. *See Pettit*, 171 Wis. 2d at 646.